Filed 12/11/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| DANIEL JAVORSKY,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>WESTERN ATHLETIC CLUBS, INC.,<br><br>     Defendant and Respondent. | A142254<br><br>(San Francisco County<br>Super. Ct. No. CGC13528384) |

Daniel Javorsky appeals from a summary judgment entered against him on his claims under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.). He urges that the court erred in ruling that a health and fitness club did not violate the Unruh Civil Rights Act by charging persons ages 18 to 29 a lower membership fee than it charged to persons age 30 and over. Finding no arbitrary, unreasonable, or invidious discrimination, we will affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

Respondent Western Athletic Clubs, Inc. (WAC)[1] owns and operates 10 "luxury" health and fitness clubs in the San Francisco Bay Area (with facilities in San Francisco, Marin, San Mateo, and Santa Clara counties), as well as a sports resort in San Diego. Members have access to services and activities designed to promote physical fitness and general well-being, including exercise equipment, swimming pools, basketball, squash, tennis courts, personal training services, and spa treatments.

---

[1] The appellate record indicates that the named defendant in this action, Western Athletic Clubs, Inc., no longer exists, and the proper defendant is Western Athletic Clubs, LLC.

A. <u>WAC Membership Levels and Discounted Membership Programs</u>

WAC offers a range of membership levels, providing various privileges at one or more of its locations. The Club West Premier membership is the most expensive, granting access to all of WAC's facilities and, in 2013, costing approximately $260 per month. By comparison, a standard membership granting access only to WAC's Bay Club San Francisco cost approximately $195 per month.

WAC also offers reduced-cost memberships. For example, a corporate discount program pertains to employees of companies that have partnered with WAC to promote their employees' health, fitness, and well-being. And a family membership is available to couples and families who join WAC together, offering memberships that are less expensive on a per-person basis.

The Young Professional program—at issue in this litigation—offers a reduced-cost membership for individuals ages 18 to 29. Launched in 2003, the program is offered at all WAC facilities except the Bay Club Ross Valley and Pacific Sports Resort San Diego. Due to capacity constraints, Young Professional members do not have access to two WAC clubs (the Courtside Club and the Pacific Sports Resort Redwood Shores) during specified "peak" hours.

In 2013, a Young Professional membership at the Bay Club San Francisco cost approximately $140 per month—$55 less than a standard membership. In 2008, members in the Young Professional program paid an initiation fee of $250 and monthly dues of $97 for a single-club membership at the Bay Club San Francisco, while members age 30 and over were charged an initiation fee of $975 and monthly dues of $154. Young Professional members also received reduced pricing for WAC's Executive Club Premier membership.

WAC maintains that the Young Professional discount reflects the reduced financial resources of the under-30 age group. WAC's chief executive officer (CEO), Matthew Stevens, retained the program to promote WAC's membership to younger individuals who might not otherwise be able to afford to join WAC's clubs. According to

Stevens, WAC hopes its Young Professional program will inspire younger people to pursue a lifetime of health and fitness and eventually join WAC as full members.

WAC also offers a senior discount program to individuals age 65 and over. In 2013, members in this program at the Bay Club San Francisco paid just $80 per month, as compared to $140 for a Young Professional membership and $195 for a standard individual membership. However, senior members have access to the facilities only during nonpeak hours between noon and 5:00 p.m. on weekdays and cannot enter the facilities after 3:00 p.m. The senior discount is therefore an option for older members who desire a more affordable membership and are willing to use WAC's clubs during off-peak hours; customers age 65 and over may alternatively choose to pay the standard rate (higher than the Young Professional rate) for an unrestricted membership.

B.  Javorsky's Lawsuit

In January 2013, Javorsky filed a complaint against WAC alleging that he joined the Bay Club San Francisco in approximately 2008, purchased a standard individual membership at the rate of $145 per month, and remained a member until he terminated his membership in June 2011 due to cost. Purporting to represent a class of similarly situated individuals, Javorsky asserted that the Young Professional discount constituted illegal age discrimination and violated the Unruh Civil Rights Act, the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.), and the UCL.

1.  WAC's Demurrer

WAC filed a demurrer to the complaint, arguing among other things that businesses may offer reasonable age-based discounts that promote access to beneficial activities for age groups with lower incomes, and its Young Professional discount is a reasonable measure to enable greater access to WAC's facilities.

Javorsky opposed the demurrer, contending that WAC's age-based pricing policy was unlawful because it could not be justified by any "compelling societal interest" or strong public policy demonstrated by legislation.

3

The trial court sustained WAC's demurrer as to Javorsky's CLRA claim without leave to amend, but overruled the demurrer as to Javorsky's claims under the Unruh Civil Rights Act and the UCL.

### 2. WAC's Motion for Summary Judgment

WAC thereafter moved for summary judgment on Javorsky's remaining claims. WAC again argued that its age-based pricing practice "promotes access to its clubs for those who might not otherwise be able to afford to join them" and California law permits reasonable discounts for this purpose. In support of its motion, WAC submitted a declaration from its CEO describing the Young Professional program and other membership programs as discussed *ante*. WAC also relied on a declaration from Shelley Lapkoff, Ph.D., an expert demographer, who analyzed publicly available income data and concluded that the median income of 18- to 29-year-olds (the group pertinent to the Young Professional program) was lower than the median income of individuals over 30.

More specifically, Dr. Lapkoff analyzed income data from the U.S. Census Bureau's American Community Survey and concluded that, in each of the five counties where WAC operates—and California-wide—individuals under age 30 had significantly lower median income than individuals over age 30. In San Francisco County, where the disparity between the two age groups was the smallest, adults under age 30 earned only about half as much as those ages 30 to 64. In Marin County, individuals ages 18 to 29 earned only 23 percent as much as those over 30. Dr. Lapkoff also organized the data into 10-year age groups and confirmed that, in each relevant geographical region, individuals ages 18 to 29 had significantly lower median income than individuals in their thirties, forties, fifties, and sixties. Dr. Lapkoff concluded that "the financial resources of the 18–29 population are substantially less than those of the 30–64 population."

### 3. Javorsky's Opposition to the Summary Judgment Motion

After a period of discovery, including Javorsky's deposition of WAC's CEO and Dr. Lapkoff, Javorsky filed his opposition to WAC's summary judgment motion.

Javorsky argued, essentially, that charging persons over the age of 30 a higher price than persons 18 to 29 violated the Unruh Civil Rights Act because the practice was not supported by a compelling societal interest or other strong public policy. In addition, Javorsky questioned WAC's true purpose behind the Young Professional program and contended there were triable issues of material fact as to whether WAC's age discrimination was supported by any legitimate business interest.

Javorsky also relied on his own expert witness, Ernest H. Manuel, Jr., Ph.D., who analyzed Dr. Lapkoff's opinion and evaluated whether, from an economic standpoint, WAC's Young Professional program was arbitrary or unreasonable. Like Dr. Lapkoff, Dr. Manuel focused on data from the American Community Survey and on median rather than mean income, and his tabulation of median personal and household incomes was substantially the same as Dr. Lapkoff's. Dr. Manuel criticized Dr. Lapkoff's analysis, however, in several respects.

Dr. Manuel found Dr. Lapkoff's analysis flawed because she defined "income" and "financial resources" in a limited manner without considering expenses such as health care costs, child care costs, or housing and food costs, which are likely to be higher for people over 30. Moreover, Dr. Manuel faulted Dr. Lapkoff for not analyzing single-person households, which he opined provide a purer measure of income than the measures analyzed by Dr. Lapkoff.

Dr. Manuel further criticized Dr. Lapkoff's reliance on median incomes for large age groups, on the ground that median income, which merely represents the midpoint of an income distribution, says nothing about whether any *individual* has higher or lower income than the median of his or her own age group, the median of any other age group, or an individual in any other age group.

For example, Dr. Manuel observed, inclusion of lower-earning 18- to 24-year-olds in the 18-to-29 age group reduces the median income for the 18-to-29 age group. Looking solely at 25- to 29-year-olds (that is, singling out a part of the group WAC makes eligible for its Young Professional discount), Dr. Manuel found (1) the median personal and household incomes for individuals ages 25 to 29 is higher than the median

5

personal and household incomes for all five-year age ranges from age 50 and up in San Francisco County; and (2) as to *single*-person households, the 25-to-29 age group has a higher median personal income than the 30-to-34 age group and all five-year age groups from 60 and up in Marin County, all five-year age groups from 55 and up in San Diego County, all five-year age groups from 50 and up in San Francisco County, and all five-year age groups from 60 and up in San Mateo and Santa Clara Counties. Dr. Manuel further opined that actual incomes vary widely within any age group.

According to Dr. Manuel, "[A]ge is an imprecise predictor of a person's income" and "If WAC wanted to offer discounts in order to attract individuals with reduced incomes, it would be more reliable to inquire about income directly rather than use age as a basis for discriminatory pricing."

### 4. Trial Court's Grant of Summary Judgment

The trial court granted WAC's summary judgment motion. The court ruled that WAC had made the required showing that its Young Professional discount is reasonable and not arbitrary, and Javorsky had not established a triable issue of material fact. Because Javorsky had no claim under the Unruh Civil Rights Act as a matter of law and his UCL claim was derivative, summary judgment was ordered and entered accordingly.

This appeal followed.

## II. DISCUSSION

In reviewing the grant of summary judgment, we conduct an independent review to determine whether there is a triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.) We construe the moving party's evidence strictly, and the non-moving party's evidence liberally, in determining whether there is a triable issue. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 20; *Alex R. Thomas & Co. v. Mutual Service Casualty Ins. Co.* (2002) 98 Cal.App.4th 66, 72 (*Thomas*).)

6

A defendant seeking summary judgment must show that at least one element of the plaintiff's cause of action cannot be established, or that there is a complete defense to the cause of action. (Code Civ. Proc. § 437c, subd. (p)(2).) The burden then shifts to the plaintiff to show there is a triable issue of material fact on that issue. (See Code Civ. Proc., § 437c, subd. (p)(2); *Thomas*, *supra*, 98 Cal.App.4th at p. 72.)

A. Unruh Civil Rights Act

We begin with an overview of the Unruh Civil Rights Act and resolve the parties' debate over the appropriate analytical standard in this case. We then consider whether WAC established its entitlement to judgment as a matter of law, and Javorsky's assertion that there are triable issues of material fact.

1. Overview

The Unruh Civil Rights Act (Act), codified at Civil Code section 51 et seq., provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

Although the Act explicitly lists sex, race, and other types of discrimination, this list is illustrative rather than restrictive, and the Act's protection against discrimination is not confined to these enumerated classes. (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 730, 732 (*Marina Point*).) Indeed, the Act's " 'language and its history compel the conclusion that the Legislature intended to prohibit *all arbitrary discrimination by business establishments*,' " whether or not the ground of discrimination is expressly set forth in the Act. (*Id*. at p. 732; see *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 842–843 (*Koebke*) [personal characteristics covered by the Act encompass both "the categories enumerated in the Act and those categories added to the Act by judicial construction"]; *Harris v. Capital Growth Investors XIV* (1991)

7

52 Cal.3d 1142, 1160–1169 (*Harris*) [establishing analytic framework for determining whether discrimination of a category not enumerated in the Act should be cognizable].)

As relevant here, there is no dispute that California courts have applied the Act to discrimination based on age. (E.g., *Marina Point*, *supra*, 30 Cal.3d at p. 730; *Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1174 (*Pizarro*).) Furthermore, the Act targets not just the practice of outright exclusion, but pricing differentials as well. (E.g., *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 30 (*Koire*); *Chabner v. United of Omaha Life Ins. Co.* (9th Cir. 2000) 225 F.3d 1042, 1050 (*Chabner*).)

Nonetheless, the Act does not absolutely preclude a business establishment from disparate treatment of patrons in all circumstances. The "fundamental purpose of the Unruh Civil Rights Act is the elimination of *antisocial* discriminatory practices—not the elimination of socially beneficial ones." (*Sargoy v. Resolution Trust Corp.* (1992) 8 Cal.App.4th 1039, 1049 (*Sargoy*), italics added.) Thus, the Act renders unlawful "only *arbitrary, invidious or unreasonable discrimination.*" (*Id*. at p. 1043, italics added; *Pizarro*, *supra*, 135 Cal.App.4th at p. 1174; *Sunrise Country Club Assn. v. Proud* (1987) 190 Cal.App.3d 377, 380–381; see *Chabner*, *supra*, 225 F.3d at p. 1050 ["disparities in treatment and pricing that are reasonable do not violate the Unruh Act"; "[t]he critical question, therefore, is whether [the challenged policy] was 'reasonable' "].) Discrimination may be reasonable, and not arbitrary, in light of the nature of the enterprise or its facilities, legitimate business interests (maintaining order, complying with legal requirements, and protecting business reputation or investment), and public policy supporting the disparate treatment. (*Koire*, *supra*, 40 Cal.3d at p. 31; *Harris*, *supra*, 52 Cal.3d at p. 1162; *Pizarro*, *supra*, 135 Cal.App.4th at p. 1174.)

### 2. Analytical Standard

While the parties acknowledge these general principles, they vigorously debate the appropriate analytical standard for this case. Javorsky maintains that, because public policy disfavors age discrimination, a practice that discriminates on the basis of age is unlawful under the Act unless it is supported by a "compelling societal interest" or at

least a strong public policy reflected in legislative enactments. WAC insists that a "relatively permissive standard" applies to age discrimination, at least in the area of pricing. We resolve the debate by turning to the case law.

### a. Javorsky's Argument: Compelling Societal Interest and Statutes

In *Marina Point*, *supra*, 30 Cal.3d 721, an apartment complex maintained a policy of excluding families with children under the age of 18. (*Id*. at pp. 726–727.) The landlord urged that its policy was reasonable and not arbitrary—and thus not in violation of the Act—because children are noisier and more mischievous than adults. (*Id*. at p. 737.) The court rejected this argument because, while the Act allows exclusion of an individual based on that individual's improper conduct, it does not tolerate a generalized prediction that a class as a whole is more likely to commit misconduct. (*Id*. at pp. 738–739.) The landlord also argued that its policy was reasonable because the presence of children did not accord with the nature of its business and facilities, analogizing its proposed adults-only residence to adult bookstores or theaters; the court rejected this argument as well. (*Id*. at p. 741.)

On this latter issue, the court in *Marina Point* ventured into an area of potential interest to the parties in this case, in its differentiation between the exclusion of children from the landlord's apartment complex and the exclusion of children from housing reserved for the elderly. The court explained: "Such facilities are designed for the elderly and in many instances have particular appurtenances and exceptional arrangements for their specified purposes." (*Marina Point*, *supra*, 30 Cal.3d at p. 742.) Moreover, "[i]n light of the *public policy reflected by these legislative enactments*" pertinent to the housing needs of the elderly, "age qualifications as to a housing facility reserved for older citizens can operate as a reasonable and permissible means under the Act of establishing and preserving specialized facilities for those particularly in need of such services or environment." (*Id*. at pp. 742–743, italics added.) The landlord in *Marina Point*, by contrast, could not "plausibly claim that its exclusionary policy serves any *similarly compelling societal interest*." (*Id*. at p. 743, italics added.) "It can hardly

9

contend, for example, that the class of persons for whom Marina Point seeks to reserve its housing accommodation, i.e., single adults or families without children, are more in need of housing than the class of persons whom the landlord has excluded from its apartment complex . . . ." (*Id*. at p. 743.) The court held that the landlord's no-children policy violated the Act.

Similar language appears in *Koire*, *supra*, 40 Cal.3d 24, involving a sex-based pricing discount. There, the plaintiff filed suit against numerous car washes and bars that maintained "Ladies' Day" and "Ladies' Night" discounts for females. (*Id*. at p. 27.) The court rejected the defendants' arguments that the discounts were not arbitrary merely because they were profitable and encouraged women to socialize with men. (*Id*. at pp. 32–33.) The court also distinguished the defendants' sex-based discount from permissible age-based discounts provided to children and to the elderly, since legislative enactments recognized the need for differential treatment of minors and the special needs of the elderly, and children and the elderly frequently have limited earning capacities. (*Id*. at pp. 37–38.) Citing *Marina Point* in dictum, *Koire* added that excluding children from bars or adult bookstores is permissible because the exclusion is based on a "compelling societal interest." (*Id*. at p. 31.)[2] Elsewhere in *Koire*, however, the court explained that price discounts are impermissible under the Act if they are contingent on some "arbitrary, class-based generalization." (*Id*. at p. 36.)

Based on *Marina Point* and *Koire*, Javorsky insists that any age-based discrimination is unlawful under the Act unless it is supported by a "compelling societal interest" or "public policy reflected by . . . legislative enactments." (*Marina Point*, *supra*, 30 Cal.3d at pp. 742–743.)[3] His analysis is incorrect.

---

[2] In addition, *Koire* observed that the nature of the business enterprise or its facilities has most often been a basis for upholding a discriminatory practice only when there is a strong public policy in favor of such treatment. (*Koire*, *supra*, 40 Cal.3d at p. 31.) WAC does not rely on the nature of its business enterprise or its facilities.

[3] Javorsky also relies on *Koebke*, *supra*, 36 Cal.4th 824. There, a country club provided membership benefits to a member's spouse but not to a member's domestic partner. (*Id*. at p. 833.) At issue was whether the Act applied. The court concluded that

10

In the first place, *Marina Point* involved an *exclusionary* policy and *Koire* pertained to a *sex*-based policy; neither addressed the *age*-based *pricing* policy at issue here. (Indeed, *Marina Point* did not really involve age discrimination, but discrimination against families with children.) But more fundamentally, the phrase "compelling societal interest" in *Marina Point* and *Koire* was simply a way of stating that the justification tendered for the disparate treatment would have to be of sufficient societal benefit to render the disparate treatment reasonable and not arbitrary. The phrase does not necessarily mandate an extraordinarily high or laudable justification in every conceivable case under the Act, but merely one that is sufficient given the nature of the *particular* disparate treatment at issue and other attendant circumstances. In addition, while it is true that *Marina Point* and *Koire* referred to "legislative enactments" as *evidence* of public policy favoring children and the elderly, neither case held that disparate treatment could never be lawful under the Act *unless* there was a statute favoring the class that was the beneficiary of the disparate treatment.

Cases subsequent to *Marina Point* and *Koire* bear out our conclusion.

In *Starkman v. Mann Theatres Corp.* (1991) 227 Cal.App.3d 1491 (*Starkman*), the plaintiff challenged a movie theater's pricing policy of offering discounted movie tickets to children and seniors. (*Id*. at p. 1493.) Noting that the court in *Marina Point* indicated that an exclusionary policy must serve a " '*compelling* societal interest' " while the court in *Koire* indicated that a pricing policy must not constitute "arbitrary, class-based generalization" (and without noting *Koire*'s reference to compelling societal interests), the court in *Starkman* concluded that the pivotal question in evaluating the theater's pricing policy was simply whether it involved an "arbitrary, class-based generalization." (*Id*. at p. 1497.)

The court in *Starkman* also took note of the distinction *Koire* made between sex-based discounts and age-based discounts for children and the elderly, quoting *Koire*'s

the plaintiffs' marital status discrimination claim was cognizable under the Act for the period beginning with the enactment of the California Domestic Partner Rights and Responsibilities Act of 2003. (*Id*. at pp. 839, 852.)

11

observation that age-based discounts are "justified by social policy considerations as evidenced by legislative enactments." (*Starkman*, *supra*, 227 Cal.App.3d at p. 1499.) But *Starkman* characterized the existence of such legislative enactments not as a requirement, but as a "*factor* we may consider in determining if a classification violates" the Act. (*Ibid.*, italics added.) Ultimately, *Starkman* concluded that the discount for children and seniors did not violate the Act: the discount was designed to promote the family-oriented nature of the business; it benefited disadvantaged groups (since seniors and children have less disposable income); public policy encouraged the availability of societal benefits to children and the elderly; and statutes in other contexts were designed to assist children and the elderly. (*Id*. at pp. 1498–1499.) Further, the court observed, the disparate treatment did not perpetuate irrational stereotypes; unlike other classifications "(e.g., race, sex, and national origin), all persons benefit from these discounts during their lifetimes, first as children and then as senior citizens." (*Id*. at pp. 1499, 1501.)

Here, in light of *Starkman* and *Koire*, we must examine the age-based pricing in this case to determine whether, under the circumstances, it constitutes *arbitrary* discrimination. The existence of a particular statute favoring the age group may be evidence of public policy justifying the discrimination, but it is not the only factor to be considered in evaluating the overall arbitrariness or reasonableness of the practice.

To similar effect is *Sargoy*, *supra*, 8 Cal.App.4th 1039, involving another type of age-based economic preference. There, a bank offered savings accounts with higher interest rates to customers age 55 and older. (*Id.* at p. 1042.) The court noted that not all distinctions based on age are unlawful, but only "arbitrary, invidious or unreasonable discrimination." (*Id.* at p. 1043.) Citing *Koire* and *Starkman*, the court observed that discriminatory treatment was uniformly held to be reasonable and nonarbitrary where a strong public policy exists in favor of such treatment. (*Ibid.*) These same policy considerations applied to the preferential interest rate for seniors, which "does not constitute the type of arbitrary and invidious discrimination falling within the ambit of the [Act]." (*Id.* at pp. 1045–1046.) In addition, the court noted, prohibiting the bank's

12

favorable treatment to seniors would jeopardize other socially desirable benefits and diminish the quality of life of senior citizens. (*Id.* at p. 1049.)

Finally, in *Pizarro*, *supra*, 135 Cal.App.4th 1171, the court addressed an age-based price discount for a group other than children and the elderly. There, a theater offered "baby-boomers" (individuals born between 1946 and 1964) discount tickets to a musical called "Boomers" concerning their generation. (*Id*. at p. 1173.) Reiterating that "[t]he objective of the Act is to prohibit businesses from engaging in unreasonable, arbitrary or invidious discrimination," the court concluded the discount did not constitute an arbitrary, class-based generalization. (*Id*. at p. 1174.) First, the discount for baby boomers would encourage attendance at a family-based entertainment event: "Because a theater ticket discount allows greater access to the theater, public policy favors the disparate treatment, whether the discount is made available to children, seniors or 'baby-boomers.' " (*Id*. at p. 1176.) Second, *without identifying any statute* favoring baby boomers, the court relied on a passage in a United States Supreme Court case to conclude that the baby boomer generation, in light of age and a corresponding lack of job security and disposable income, would benefit from price discounts as do children and seniors.[4] (*Ibid*.) Third, the court determined, the discount to baby boomers would not perpetuate any irrational stereotypes. (*Ibid*.) Indeed, the discount was given to all baby boomers whether or not they possessed the personal characteristics enumerated in the Act. (*Ibid*.)

*Starkman*, *Sargoy*, and *Pizarro* collectively teach that, consistent with our Supreme Court's decision in *Koire*, the Act's objective of prohibiting "unreasonable, arbitrary or invidious discrimination" is fulfilled by examining whether a price differential reflects an "arbitrary, class-based generalization." They further instruct that a policy treating age groups differently in this respect may be upheld, at least if the pricing policy (1) ostensibly provides a social benefit to the recipient group; (2) the recipient

---

[4]     The court in *General Dynamics Land Systems, Inc. v. Cline* (2004) 540 U.S. 581, 588, stated there were "unjustified assumptions about the effect of age on ability to work." " 'At age 40, a worker may find that age restrictions become common . . . . By age 45, his employment opportunities are likely to contract sharply; they shrink more severely at age 55 and virtually vanish by age 65.' "

group is disadvantaged economically when compared to other groups paying full price; and (3) there is no invidious discrimination. (*Starkman*, *supra*, 227 Cal.App.3d at pp. 1498–1499; *Sargoy*, *supra*, 8 Cal.App.4th at pp. 1045–1046; *Pizarro*, *supra*, 135 Cal.App.4th at p. 1176.) In those instances, public policy justifies the discrimination; legislative enactments are sufficient, but unnecessary, to evince the public policy.

### b. *WAC's Argument: "Relatively Permissive Standard"*

WAC points out that the Act has been amended several times to increase the number of enumerated classifications from five to eleven, but the Legislature has never amended the Act to specify "age" as an enumerated classification. WAC does not go so far as to contend this means that age discrimination is not covered by the Act; but it does argue that "[c]onsistent with legislative intent," California courts apply a "relatively permissive standard" to age-based distinctions, at least as to pricing.

We question whether the absence of "age" in the Act reflects any legislative intent for courts to apply a different *standard* to age discrimination. There is no express legislative statement to that effect. Furthermore, while California appellate courts have held for decades that the enumerated categories are merely illustrative and the Act's protections extend to age discrimination, the Legislature has never amended the Act to provide that age-based classifications are *not* covered by the Act or should be governed by a different standard. (See *Marina Point*, *supra*, 30 Cal.3d at p. 734 [discussing legislative acquiescence].)[5] Nor does WAC point to any California precedent holding that age-based treatment is subject to a "relatively permissive standard" of scrutiny. Age discrimination, like discrimination on the basis of the categories expressly set forth in the

---

[5] Javorsky requests that we take judicial notice of the bill analysis for the Act's 2005 amendments, which declared "the Legislature's intent that the enumerated bases in the Act continue to be construed as illustrative rather than restrictive." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1400 (2005–2006 Reg. Sess.) as amended Apr. 11, 2005, p. 2.) In light of WAC's legislative history arguments and in the absence of any objection, we grant that request. Javorsky further requests that we take judicial notice of a complaint filed in federal district court, in an action between parties not involved in this case, concerning age discrimination. We deny that request.

14

Act, is illegal if it is arbitrary, unreasonable or invidious. (*Pizarro*, *supra*, 135 Cal.App.4th at p. 1174; *Sargoy*, *supra*, 8 Cal.App.4th at p. 1043.)[6]

On the other hand, while the analytical *standard* for age-based discrimination is the same as for other types of discrimination, the nature and context of age-based discrimination may more likely lead to the *conclusion* that the discrimination is not arbitrary. As the court in *Pizarro* remarked: "[C]ourts treat age classification differently from categories enumerated in the statute. There is no general prohibition against all age-based discrimination or preferential treatment, as there is with the categories expressly mentioned in the Act." (*Pizarro*, *supra*, 135 Cal.App.4th at p. 1175.) Indeed, courts have recognized that age-based disparate treatment may be justified by the circumstances of the age group that is being favored, and treatment on the basis of age is less likely to perpetuate stereotypes than discrimination on the basis of immutable characteristics such as sex and race. (*Starkman*, *supra*, 227 Cal.App.3d at pp. 1498–1501; *Pizarro*, at p. 1176.) And since we all age over time, age-based benefits are often something that all members of society, at some point in life, can enjoy. (*Starkman*, at p. 1501.)

With these precepts in mind, we turn to the parties' arguments.

B. <u>WAC Met Its Burden on Summary Judgment</u>

WAC contends that its Young Professional discount is reasonable and not arbitrary because (1) it expands access to beneficial, recreational activities; (2) it benefits an age group with limited financial resources; and (3) it does not perpetuate any invidious stereotypes.

---

[6]    WAC argues that, in a more recent decision "analyzing" *Koire*, our Supreme Court "confirmed that appropriate age-based discounts are considered '*non*-discriminatory' under the Unruh Act." (Citing *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 174–175 (*Angelucci*).) But *Angelucci* did not deal with age-based discrimination. The court held that males, who had to pay a higher admission fee to a supper club than females, did not have to make an express demand for equal treatment in order to sue under the Act. (*Id*. at p. 164.) In the paragraph WAC cites, *Angelucci* merely recounted that in *Koire* the court had described policies permitting discounts for children or older adults and stated that the impermissibility of sex-based price discounts did not impact the validity of age-based discounts.

15

### 1. Societal Benefit: More Affordable Recreational Activities

California courts have approved age-based discounts that promote participation in beneficial activities. (*Pizarro*, *supra*, 135 Cal.App.4th at p. 1176 [public policy favored a ticket discount for "baby-boomers" because it encouraged attendance at a "family-based entertainment event"]; *Starkman*, *supra*, 227 Cal.App.3d at p. 1499 [reasonable discounts allow people to "enjoy[] some of the pleasures of our society" and "American pastimes" such as baseball games, amusement parks, Disneyland, the zoo, museums, campgrounds, state fairs, parks, and movies]; cf. *Koire*, *supra*, 40 Cal.3d at p. 33 [rejecting nightclub's argument that its gender-based discount served a "socially desirable goal" by encouraging women to socialize with men in a bar].)

Akin to the discounts in *Starkman* and *Pizarro*, the Young Professional discount increases access of 18- to 29-year-olds to worthy facilities and activities promoting physical fitness, including swimming, basketball, squash, tennis, and the like.

### 2. Benefit to Age Group With Relatively Limited Financial Resources

Age-based discounts have been upheld where they benefited age groups with relatively limited financial resources. (*Sargoy*, *supra*, 8 Cal.App.4th at pp. 1048–1049 [higher interest rates for deposits by seniors]; *Starkman*, *supra*, 227 Cal.App.3d at p. 1499 [discounted movie-theater tickets for children and seniors]; *Pizarro*, *supra*, 135 Cal.App.4th at p. 1176 [discounted theater tickets for "baby-boomers"].)

WAC contends the 18-to-29 age group benefited by the Young Professional discount has relatively limited resources like the groups at issue in *Pizarro* and *Starkman*, and the discount promotes access to WAC's clubs for those who might not otherwise be able to afford to join them. WAC's justification for its Young Professional discount thus raises two questions: (1) did WAC submit sufficient evidence that persons ages 18 to 29 have a lower economic position than persons age 30 and older; and (2) is providing an economic benefit to this group, for the purpose of furthering access to WAC's luxury health clubs, an adequate justification for disparate treatment?

16

*a. Evidence of Limited Income and Net Worth of Persons 18 to 29*

In support of its summary judgment motion, WAC presented evidence from its expert witness demographer, Dr. Lapkoff, that individuals under age 30 tend to have substantially less disposable income than individuals over 30. Dr. Lapkoff found that, in each of the counties where WAC operates, and in California as a whole, a significant income gap exists between the group eligible for the Young Professional discount and their older counterparts. This gap was largest in Marin County, where individuals ages 30 to 64 earned more than four times the median income of individuals ages 18 to 29. In San Francisco, where the two groups' income levels were closest, the older group earned approximately double the median income of the younger group.

WAC points out that, in every county with a WAC club, individuals under 30 earned far less than individuals in their forties and fifties—individuals who would have been eligible for the discount approved in *Pizarro*. In all but one of those counties, individuals under 30 tended to earn less than those over 65—an age group benefiting from discounts approved in *Starkman* and *Sargoy*. Household income for the entire state and the relevant counties corroborated this income disparity between people under 30 and people ages 30 to 64.

Dr. Lapkoff's findings regarding net worth reinforced the results obtained from her review of income data. Reviewing national data from the Federal Reserve Board, Dr. Lapkoff found that families with heads of household under age 35 had virtually no net worth compared to families with older heads of household.

From this evidence, a trier of fact could reasonably conclude that persons 18 to 29 are less able to afford a WAC membership than persons 30 and over.

*b. Sufficiency of Justification*

Javorsky contends, however, that WAC's purported goal of facilitating access for an age group with lower income is insufficient to justify its age-based pricing plan, for two reasons.

17

First, Javorsky attacks the *connection* between an age bracket and income: age brackets are poor indicators of income, there were alternative ways WAC could accomplish its goal of assisting patrons financially, and Dr. Lapkoff failed to consider the expenses borne by the age groups in his analysis. Despite Dr. Lapkoff's median income figures, Javorsky points out, certain individuals in the under-30 age group will earn more than certain individuals in the over-30 group. Indeed, Dr. Lapkoff's results show that people age 28 have equal to or greater median income than people ages 33, 35, 41, 44, 46, 47, 49, and 51 to 89. Javorsky insists it would be better for WAC to have a pricing structure based on income rather than age.

These arguments miss the mark. If accepted, Javorsky's arguments would obliterate *all* age-based discounts—including those upheld in *Starkman* and *Pizarro*— since all age groups include persons with higher incomes and persons with lower incomes. Moreover, the question is not whether WAC could do a *better* job making memberships affordable. The question is whether the Young Professional program is arbitrary. Because persons ages 18 to 29, as a group, have less income than persons age 30 and over, providing lower prices to persons ages 18 to 29, as a group, is not arbitrary.

Second, Javorsky attacks the *societal benefit* of facilitating access for 18- to 29-year-olds, urging that it is not sufficiently supported by public policy. After all, the plight of "young professionals" in the San Francisco Bay Area is a far cry from the economic plight the Legislature had in mind when protecting children and seniors. No statute or published decision identifies 18- to 29-year-olds in the San Francisco Bay Area as a "financially disadvantaged" group entitled to a "luxury" health and fitness club. While WAC's evidence provided an economic comparison between groups, it said little about the actual ability of 18- to 29-year-olds to afford a membership. Furthermore, the age-based discounts approved in *Starkman* and *Pizarro* were for low monetary amounts and one-time events, not memberships over the course of as many as 12 years.

The question, however, is not whether 18- to 29-year-olds in the Bay Area are impoverished, or whether they suffer the same economic, physical, or social disadvantages as children and the elderly. The question here is rooted in the particular

18

facts at hand: whether 18- to 29-year-olds, as a group, have some economic disadvantage *when compared to those over 30*, as a group, so as to justify lower prices for 18- to 29-year-olds to access the health club enjoyed by those over 30. WAC's evidence was sufficient to carry its burden in this regard. And while there may not be an exceedingly strong public policy favoring the access of 18- to 29-year-olds to a luxury health club, neither is there an exceedingly strong public policy entitling persons over 30 access to a luxury health club for the same discounted price.

Furthermore, while we have rejected Javorsky's contention that WAC must be able to point to a specific statute favoring the 18-to-29 age group to justify its age-based pricing, the law is not entirely bereft of indications that persons under 30—including students and those just beginning their careers—might feel economic pressures worthy of attention and assistance as a public policy matter. For example, WAC points us to a provision in the Patient Protection and Affordable Care Act that requires health insurance providers offering dependent coverage to make that coverage available for an adult child until the child turns 26. (42 U.S.C. § 300gg-14.) The legislative history of the provision includes the following statement by Senator Durbin: "Today, in most cases, if your child has reached the age of 24, they are off your family plan. Well, we extend that now so those 24 and 25 will have the protection of their family health insurance plan while they finish school, look for their first job and obtain their own health insurance. That is going to be peace of mind for a lot of families across America, just those 2 years *when young people are the most vulnerable and need the protection* of their family health insurance plan." (155 Cong. Rec. S13647, S13649 (2009), italics added.)[7]

Finally, Javorsky urges that the Young Professional program yields a result contrary to *Pizarro* and other cases, because it favors persons ages 18 to 29 *over* baby boomers and the elderly, whom state and federal legislatures have protected. He insists

---

[7]    Javorsky counters that 42 United States Code section 300gg-14 was intended to benefit older persons (or families) with dependent adult children, not persons 18 to 29. (See 26 U.S.C. § 5000A.) Regardless, the provision is premised on the understanding that the economic circumstances of persons 18 to 26 may preclude them from affording insurance.

that the program disadvantages these groups by requiring them to pay more for membership or, for those 65 or older, to access WAC's facilities at nonpeak times.

But Javorsky misperceives *Pizarro* and the other cases approving economic benefits to baby boomers and seniors. Those cases merely concluded that particular policies did not run afoul of the Act. They did not ordain that baby boomers or seniors must always receive the lowest price, or require every business establishment to reserve its best deals for them.

### 3. Invidious Discrimination

Invidious discrimination is the treatment of individuals in a manner that is malicious, hostile, or damaging. The Young Professional discount does not do this. It applies equally to all persons regardless of their "sex, color, race, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation or to persons regardless of their genetic information." (Civ. Code, § 51.) Moreover, it does not perpetuate any harmful stereotypes regarding the age groups at issue. (*Starkman*, *supra*, 227 Cal.App.3d at p. 1499 ["[e]stablishing different price rates for seniors and children in an amusement business does not perpetuate irrational stereotypes"]; *Pizarro*, *supra*, 135 Cal.App.4th at p. 1176 ["[p]roviding discounted theater admissions to 'baby-boomers' to attend a musical about that generation does not perpetuate any irrational stereotypes"]; cf. *Koire*, *supra*, 40 Cal.3d at p. 34 ["differential pricing based on sex may be generally detrimental to both men and women, because it reinforces harmful stereotypes"].)

Javorsky nonetheless contends the Young Professional discount perpetuates "ageism" and the harmful stereotype that "young is better." He asserts there are "unjustified assumptions" about the ability of the 40-to-65 age group to obtain work.

20

(See *Pizarro*, *supra*, 135 Cal.App.4th at p. 1176.) And he claims that its invidious nature is demonstrated by the fact that WAC received some complaints from its older members.[8]

Javorsky's argument lacks merit. Offering a reasonable discount to a particular age group does not suggest that the group is *better* than another. Even if it did, the Young Professional program in this case does not communicate malice, hostility, or damage to persons over 30; and persons ages 30 to 64 have not, as a group, been historical targets of discrimination or irrational stereotypes. Nor does Javorsky provide any legal authority for the proposition that the complaints of disgruntled customers can turn a discount for 18- to 29-year-olds into invidious discrimination.

4. Conclusion

In sum, WAC established that its Young Professional program provides 18- to 29-year-olds with lower-cost access to the healthful benefits of health club membership, 18- to 29-year-olds have lower median incomes than persons over 30 in the relevant geographical areas, and charging 18- to 29-year-olds less than persons over 30 does not perpetuate irrational stereotypes. Under these circumstances, WAC met its burden to demonstrate that its pricing program does not constitute arbitrary, unreasonable or invidious discrimination, the program does not reflect an *arbitrary*, class-based generalization, and, indeed, public policy supports the disparate pricing. The burden therefore shifted to Javorsky to establish a triable issue of material fact.

C. Javorsky Did Not Establish a Triable Issue of Material Fact

Javorsky reminds us that evidence submitted in opposition to a summary judgment motion must be liberally construed, as to both the admissibility of expert witness testimony and the sufficiency of the evidence to create a triable issue of material fact.

---

[8] In April 2009, WAC's CEO wrote an email stating: "Legal Issue—Members seem upset learning about YP programs. Received call from one member threatening lawsuit claiming its [*sic*] illegal to offer YP memberships in California—need to research this issue and figure out solution." In February 2010, another member over the age of 30 complained that the Young Professional program was "unfair." The following month, another member complained that people under the age of 30 and others were provided reduced-cost memberships.

(*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 189.)  This rule applies, however, only with respect to evidence that pertains to a *material* fact.  (Code Civ. Proc., § 437c, subd. (c).)

Here, Javorsky argues there are triable issues of fact as to whether WAC was really assisting economically disadvantaged persons with its Young Professional program.  Specifically, he urges there are triable issues as to (1) whether WAC's policy was a reasonable and legitimate business decision to aid economically disadvantaged individuals, as opposed to a "post hoc justification, created for purposes of this litigation"; and (2) whether there was a sufficient relationship between WAC's age-based pricing scheme and economic need, as opposed to a scheme that resulted in higher prices for many older persons with lower incomes.  Neither is material.

### 1.  WAC's Subjective Motivation

Javorsky argues that the failure of WAC's CEO to know the original basis for the 18-to-29 age bracket of the Young Professional program, the absence of documentation concerning the purpose for the program, and the lack of any income analysis by WAC, reflect a material dispute as to whether WAC's pricing scheme was really designed to address the income levels of 18- to 29-year-olds and promote WAC's legitimate business interests.  (Arguably, Javorsky's evidence in opposition to the summary judgment motion, including Dr. Manuel's view that the Young Professional age-based pricing program does not directly correlate to an individual's income level, could also draw into question the true motivations for the program.)

WAC's subjective motivations for the Young Professional discount, however, are immaterial.  The Act protects against limitations on a group's *access* to public accommodations, if those limitations reflect arbitrary, unreasonable, or invidious discrimination; it does not inquire into the subjective motivations underlying the limitation.  Neither *Starkman* nor *Pizarro* delved into the subjective thinking behind a business's pricing policy, and Javorsky cites no California precedent holding that a business's motivations factor into the analysis of an age-based discount under the Act.

22

Instead, in a footnote in his opening brief, Javorsky directs us to a ruling by a federal district court judge in *Rodriguez v. Provident Life & Accident Ins. Co.* (C.D. Cal., Mar. 2, 2001, No. CV 00-01828-GHK(CWx)) 2001 U.S. Dist. Lexis 13102 (*Rodriguez*). A federal trial court's decision is not binding on this court. Moreover, *Rodriguez* is inapposite.

In *Rodriguez*, the plaintiff had alleged claims under 42 United States Code section 1981, the Act, the UCL, and various common law causes of action, alleging that the defendant had arbitrarily discriminated against him by denying him disability insurance due to his inability to understand and speak the English language. The defendant moved for summary judgment. With respect to the claim under the Act, the defendant contended it had a rational business reason for the English proficiency requirement because it ensured that all policyholders understood and accepted the terms of its contracts and helped to avoid future litigation and the costs of having to communicate with insureds in dozens of different languages. The plaintiff produced evidence that no one ever contacted him to verify he did not speak or understand English, the literacy requirement was not generally enforced, and the company had no training or standards for its employees to determine English proficiency. The court ruled that the plaintiff had raised disputed issues of material fact as to whether "the proferred reasons are untrue and merely pretextual." (*Rodriguez*, *supra*, 2001 U.S. Dist. Lexis 13102 at p. *25.)

*Rodriguez* is distinguishable. The question in *Rodriguez* was whether the insurer's policy was *subject* to the Act because it was, in reality, a race-based classification. Here, there is no dispute that WAC's Young Professional program is an age-based classification subject to the Act. Javorsky is not arguing that there is a triable issue as to whether WAC's subjective motivation was to discriminate on the basis of age; he is arguing there is a triable issue as to whether the discrimination on the basis of age was really motivated by a desire to address the income disparity of that group. That question is immaterial to the matter at hand.

## 2. Relation Between WAC's Program and Economic Need

Javorsky contends he presented evidence that the Young Professional program, based on age, does not accomplish the stated goal of providing access to WAC's health club to individuals who could not otherwise afford it, since age is not a good indicator of economic need. He urges that this evidence raised a triable issue of fact as to whether the program was designed to accomplish its stated purpose, or effectively implemented its purpose, and therefore whether the program furthers any legitimate business or public policy. As Dr. Manuel opined, it would be "more reliable to inquire about income directly rather than use age as a basis for discriminatory pricing."

None of this evidence is material in this case, however. The material fact is that the persons in the age bracket pertinent to the Young Professional program, as a group, had less income to pay for a WAC membership than persons in Javorsky's age bracket, as a group. Whether WAC could have tailored some *other* means of addressing the income needs of 18- to 29-year-olds is not germane. While Dr. Manuel opined that the median personal income for 25- to 29-year-olds in San Francisco is higher than the median personal income for all five-year age ranges from age 50 and up, that does not disprove that 18- to 29-year-olds, as a group, are economically disadvantaged when compared to persons ages 30 to 50 in WAC's geographical markets. And while Dr. Manuel pointed out that certain expenses of the compared populations were not taken into account, he did not provide any evidence as to what those expenses would be or any means of ascertaining them.

Javorsky did not establish a triable issue of material fact. Thus, the trial court did not err in ruling that WAC was entitled to judgment on Javorsky's claim under the Act.

## D. Javorsky's Claim Under the UCL

Javorsky's claim for violation of the UCL is predicated on the alleged violation of the Act. Because the claim under the Act was properly rejected on summary judgment, we must affirm the trial court's ruling disposing of the derivative UCL claim as well.

(*Pizarro*, *supra*, 135 Cal.App.4th at p. 1177; *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050, 1068.)

## III.  DISPOSITION

The judgment is affirmed.


NEEDHAM, J.


We concur.


SIMONS, ACTING P.J.


BRUINIERS, J.


(A142257)

San Francisco County Superior Court Case No. CGC-13-528384, Curtis E. A. Karnow, Judge.

Finkelstein Thompson LLP, Rosemary M. Rivas, Caitlyn D. Finley; Glancy Prongay & Murray LLP, Marc L. Godino for Appellant.

Keker & Van Nest LLP, Susan J. Harriman, Benjamin W. Berkowitz and John C. Bostic for Defendant and Respondent.

(A142257)