Filed 1/29/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALLAN CANDELORE, | B270172 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC583162) |
| v. | |
| TINDER, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Highberger, Judge. Reversed.

The Kralowec Law Group, Kimberly A. Kralowec, Kathleen Styles Rogers; Rava Law Firm and Alfred G. Rava for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Robert H. Platt, Donald R. Brown and Christopher A. Rheinheimer for Defendant and Respondent.

———————————

1

# INTRODUCTION

Tinder, Inc. owns and operates the smartphone-based dating application, Tinder. The original app began, and is still offered, as a free online dating service. It presents users with photos of potential dates. The user can swipe right to express approval, or swipe left to express disapproval. In March 2015, Tinder released a premium service called "Tinder Plus," which allows users to access additional features of the app for a monthly fee.

Plaintiff, Allan Candelore, commenced this action on behalf of himself and a putative class of California consumers who were over 30 years old when they subscribed to Tinder Plus. The complaint alleges that Tinder charges consumers who are age 30 and older $19.99 per month for Tinder Plus, while it charges consumers under the age of 30 only $9.99 or $14.99 per month for the Tinder Plus features.[1] Candelore sued for age discrimination in violation of the Unruh Civil Rights Act (Civ. Code, § 51; the Unruh Act or the Act) and the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.; the UCL).[2] The trial court sustained Tinder's demurrer without leave to amend, ruling in part that Tinder's age-based pricing practice did not constitute arbitrary or invidious discrimination because it was reasonably based on market testing showing "younger users" are "more

---

[1]    There is some inconsistency in the record about whether the $19.99 monthly charge applies to individuals "over 30 years of age" versus "age 30 and older." For purposes of our decision, the distinction makes no difference.

[2]    Statutory references are to the Civil Code, unless otherwise stated.

budget constrained" than older users, "and need a lower price to pull the trigger."

But, as discussed below, the Unruh Act provides broad protection against arbitrary age-based price discrimination. No matter what Tinder's market research may have shown about the younger users' relative income and willingness to pay for the service, as a group, as compared to the older cohort, some individuals will not fit the mold. Some older consumers will be "more budget constrained" and less willing to pay than some in the younger group. We conclude the discriminatory pricing model, as alleged, violates the Unruh Act and the UCL to the extent it employs an arbitrary, class-based, generalization about older users' incomes as a basis for charging them more than younger users. Because nothing in the complaint suggests there is a strong public policy that justifies the alleged discriminatory pricing, the trial court erred in sustaining the demurrer. Accordingly, we swipe left, and reverse.

## STANDARD OF REVIEW

This appeal followed a judgment of dismissal after the trial court sustained Tinder's demurrer without leave to amend. "The purpose of a demurrer is to test the sufficiency of a complaint by raising questions of law." (*Sargoy v. Resolution Trust Corp.* (1992) 8 Cal.App.4th 1039, 1041 (*Sargoy*).) The court is to accept as true all allegations of fact contained in the complaint. (*Id.* at pp. 1041-1042) When a demurrer is sustained, the reviewing court must determine whether the complaint alleges sufficient facts to state a cause of action, adopting a liberal construction of the pleading and drawing all reasonable inferences in favor of the asserted claims. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1170, fn. 16 (*Harris*).)

3

## FACTS AND PROCEDURAL BACKGROUND

In addition to the factual allegations set forth in the Introduction to this opinion, Candelore's complaint included the following excerpt from a news report on the website TakePart, offering Tinder's justification for its age-based pricing:

> "The logic Tinder executives supplied for the age-related pricing? It benefits their bottom line. 'During our testing we've learned, not surprisingly, that younger users are just as excited about Tinder Plus, but are more budget constrained, and need a lower price to pull the trigger,' Tinder's vice president of corporate communications, Rosette Pambakian, told TakePart in an email. [¶] 'We've priced Tinder Plus based on a combination of factors, including what we've learned through our testing, and we've found that these price points were adopted very well by certain age demographics,' Pambakian wrote."

Tinder demurred to each cause of action, arguing the complaint failed to state a claim because (1) age-based pricing does not "implicate the irrational, invidious stereotypes" that the Unruh Act was intended to proscribe; (2) the public statement by Tinder's executive, as quoted in the complaint, "refute[d] any notion that the alleged discrimination in pricing [was] arbitrary"; and (3) age-based pricing is neither "unlawful" nor "unfair" under the UCL.

The trial court sustained Tinder's demurrer without leave to amend. With respect to the Unruh Act claim, the court ruled (1) there is "no basis in the published decisions for applying the Unruh Act to age-based pricing differentials"; (2) "Tinder's rationale that customers age 30 and younger have less capacity to

4

pay for premium services" demonstrates "the differential is not 'arbitrary, invidious or unreasonable' within the meaning of the Act"; and (3) Tinder's alleged pricing furthers the " 'public policies' " of "(a) increased access to services for the general public and (b) profit maximization by the vendor, a legitimate goal in our capitalistic economy." As for the UCL claims, the court ruled (1) Candelore's failure to allege an Unruh Act violation defeats his " 'unlawful' " prong claim; and (2) the alleged business practice is not " 'unfair' " under the UCL because "it is entirely proper for Tinder to charge alternative prices in the pursuit of profit maximization" and "the rationale for this price distinction (quoted by plaintiff in the Complaint . . . ) is a sufficient business reason for doing so."

The trial court entered judgment for Tinder, from which Candelore appeals.

## DISCUSSION

1. *Overview of the Unruh Act*

"Enacted in 1959, the Unruh Act secures equal access to public accommodations and prohibits discrimination by business establishments. Its predecessor, our state's first public accommodations statute, became law in 1897." (*Harris, supra,* 52 Cal.3d at p. 1150.) "The 1897 act was patterned in part after the National Civil Rights Act of 1875 (18 Stat. 335, ch. 114, §§ 1-2) which guaranteed to all persons within United States jurisdiction 'the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances on land or water, theaters, and other places of public amusement . . . .' " (*Harris,* at p. 1150, fn. 3.) After the United States Supreme Court invalidated the federal act, many states, including California, responded by enacting their own statutes assuring

5

access to public accommodations on a nondiscriminatory basis. (*Id.* at pp. 1150-1151, fn. 3., citing *Civil Rights Cases* (1883) 109 U.S. 3.)

The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).) The Act's "fundamental purpose" is "to secure to all persons equal access to public accommodations 'no matter' " their personal characteristics. (*Harris, supra,* 52 Cal.3d at p. 1169.) To accomplish this purpose, the Act prohibits "arbitrary discrimination by business establishments." (*In re Cox* (1970) 3 Cal.3d 205, 216 (*Cox*); *Sargoy, supra,* 8 Cal.App.4th at p. 1043 [the Act renders unlawful "arbitrary, invidious or unreasonable discrimination"].)

Although its text identifies particular kinds of discrimination – such as sex, race, and national origin – this list is "illustrative, rather than restrictive," and the Unruh Act's proscription against arbitrary discrimination extends beyond these enumerated classes. (*Cox, supra,* 3 Cal.3d at p. 212; *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 730, 732 (*Marina Point*).) Nevertheless, the enumerated categories, bearing the "common element" of being "personal" characteristics of an individual, necessarily confine the Act's reach to forms of discrimination based on characteristics similar to the statutory classifications – such as "a person's geographical origin, physical

6

attributes, and personal beliefs." (*Harris, supra,* 52 Cal.3d at p. 1160.) The "personal characteristics" protected by the Act are not defined by "immutability, since some are, while others are not [immutable], but that they represent traits, conditions, decisions, or choices fundamental to a person's identity, beliefs and self-definition." (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 842–843 (*Koebke*).)

Thus, while not *all* discrimination is prohibited (see *Harris, supra,* 52 Cal.3d at pp. 1160-1161), there is no dispute that, as relevant here, the Unruh Act proscribes arbitrary discrimination based on an individual's age – a personal characteristic similar to the classifications enumerated in the Act. (See *Marina Point, supra,* 30 Cal.3d at p. 730; *Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1174 (*Pizarro*) ["Age discrimination may violate the Act if used as an arbitrary class-based generalization"]; see also *Harris,* at p. 1153 ["the Legislature affirmed that section 51 prohibits age discrimination in the sale or rental of housing"]; *Koebke, supra,* 36 Cal.4th at p. 842 ["the phrase 'personal characteristic' in *Harris*, . . . encompasse[s] both the categories enumerated in the Act and those categories added to the Act by judicial construction" prior to the *Harris* opinion].)

The Act applies not merely in situations where businesses exclude individuals altogether, but also "where unequal treatment is the result of a business practice." (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 29 (*Koire*).) "Unequal treatment includes offering price discounts on an arbitrary basis to certain classes of individuals." (*Pizarro, supra,* 135 Cal.App.4th at p. 1174; *Koire,* at p. 29.)

7

### 2. *Tinder's Alleged Pricing Model Uses a Personal Characteristic to Discriminate Against Older Customers Based on a Generalization About Income*

Candelore asserts Tinder's alleged pricing model violates the Unruh Act because it discriminates against customers who are age 30 and over by requiring them to pay more than twice as much as younger customers to access Tinder Plus. In response, Tinder maintains this allegation is insufficient to state a claim for arbitrary age discrimination, because its pricing model rationally treats "youth [as] a *reasonable* proxy for economic disadvantage." (Italics added.) By Tinder's account, it is "self-evident that people under 30 face financial challenges," and this "common knowledge provides a reasonable and non-arbitrary basis for Tinder to offer a discount to people under 30." The trial court likewise reasoned that Tinder's age-based pricing model was "not 'arbitrary, invidious or unreasonable' within the meaning of the Act" because the complaint admitted "Tinder's rationale" was based on market research showing "customers age 30 and younger have less capacity to pay for premium services." Although past cases have suggested age can serve as a reasonable proxy for income, we conclude Tinder's alleged practice contravenes "the *individual nature* of the statutory right of equal access to business establishments that is afforded 'all persons' by the Unruh Act." (*Marina Point, supra,* 30 Cal.3d at p. 725, italics added.)

Our Supreme Court's decision in *Marina Point* is controlling. There, the Supreme Court was asked to address whether, under the Unruh Act, an apartment complex owner could lawfully refuse to rent its apartments to a family solely because the family included a minor child. (*Marina Point, supra,*

8

30 Cal.3d at p. 724.) In the landlord's action to eject one such family, the municipal court found that " '[c]hildren are rowdier, noisier, more mischievous and more boisterous than adults,' and upheld the landlord's policy of excluding all families with minor children." (*Ibid*.) Based on this finding, the landlord defended the policy on appeal, claiming it was permitted "to achieve its legitimate interest in a quiet and peaceful residential atmosphere by excluding *all* minors from its housing accommodations, thus providing its adult tenants with a 'child free' environment." (*Id*. at p. 725.) The Supreme Court disagreed.

The Supreme Court concluded the landlord's blanket exclusion of families with minor children contravened "the *individual nature* of the statutory right of equal access to business establishments that is afforded 'all persons' by the Unruh Act." (*Marina Point, supra,* 30 Cal.3d at p. 725, italics added.) Drawing a parallel to the "individual nature" of the federal Civil Rights Act, the court embraced the following holding by the United States Supreme Court regarding the federal statute: " 'The statute's focus on the individual . . . precludes treatment of individuals as simply components of a racial, religious, sexual or national class. If height is required for a job, a tall woman may not be refused employment merely because, on the average, women are too short. *Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply.*' " (*Id*. at p. 740, quoting *City of Los Angeles, Dept. of Water v. Manhart* (1978) 435 U.S. 702, 708.) Applying this principle to the landlord's adults-only policy, the *Marina Point* court held that, while the landlord retained the right to exclude persons whose *individual* conduct had disrupted its legitimate business

9

pursuits, the Unruh Act did "not permit [the landlord] to exclude an *entire class* of individuals on the basis of a *generalized prediction* that the class 'as a whole' is more likely to commit misconduct than some other class of the public." (*Marina Point,* at p. 739, second italics added; accord *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 793 (*O'Connor*) [restrictive covenant limiting residency to persons over the age of 18 declared invalid under the Unruh Act].)

Having concluded the "potential misbehavior of children as a class [did] not justify [the landlord's] exclusionary practice," the *Marina Point* court turned to whether the policy might "nonetheless be sustained as reasonable on the ground that the presence of children basically does not accord with the nature of [the landlord's] business enterprise and of the facilities provided." (*Marina Point, supra,* 30 Cal.3d at p. 741.) With respect to this issue, the court rejected the landlord's effort to analogize the restriction to the age-limited admission policies of retirement and senior living communities, which were supported by "specific 'age-conscious' legislative measures" addressed to the "special housing needs of the elderly in contemporary American society." (*Id.* at p. 742, citing Health & Saf. Code, § 51230 [reserving proportion of state-financed low income housing for occupancy by elderly]; 12 U.S.C. § 1701q [federal loan program for housing for

10

elderly families].)[3] In light of the public policies reflected in these legislative enactments, the court recognized that "age qualifications as to a housing facility reserved for older citizens can operate as a reasonable and permissible means under the Unruh Act of establishing and preserving specialized facilities for those particularly in need of such services or environment." (*Marina Point*, at pp. 742-743.) The court held the landlord "[could not] plausibly claim that its exclusionary policy serve[d] any similarly compelling societal interest," observing, the landlord could "hardly contend, for example, that the class of persons for whom Marina Point seeks to reserve its housing accommodation, i.e., single adults or families without children, are more in need of housing than the class of persons whom the landlord has excluded from its apartment complex." (*Id.* at p. 743.)

Even crediting Tinder's stated rationale, its alleged discriminatory pricing model violates the principle articulated in *Marina Point* by operating on the "generalized prediction" that an individual over the age of 30 earns more and is less budget

---

[3]     The *Marina Point* court also found the contemplated adults-only apartment complex was distinguishable from businesses such as bars and adult book stores, which could likewise "be defended by reference to . . . statutorily sanctioned restriction[s] on the activities of children." (*Marina Point, supra,* 30 Cal.3d at p. 741, citing Bus. & Prof. Code, § 25658 [furnishing alcoholic beverages to person under 21] & Pen. Code, § 313.1 [distributing " 'harmful matter' " to a minor].)

11

constrained than another individual under the age of 30.[4] (*Marina Point, supra,* 30 Cal.3d at p. 739.) Because we may reasonably infer that this generalization does not hold for all members of the respective age classes (see, e.g., *Pizarro, supra,* 135 Cal.App.4th at p. 1176), we may also infer that Tinder's pricing model will, in some cases, result in older individuals who earn less than some younger users being charged more than twice what those younger users must pay to access the Tinder Plus features. A blanket, class-based pricing model like this, when based upon a personal characteristic such as age, constitutes prohibited arbitrary discrimination under the Unruh Act. (See *Marina Point,* at p. 740 [" 'Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply,' " italics omitted].)

We recognize, however, that past cases have embraced the notion that age may serve as a reasonable proxy for income in upholding age-based discounts against Unruh Act claims. (See, e.g., *Starkman v. Mann Theaters Corp.* (1991) 227 Cal.App.3d 1491, 1499 (*Starkman*); *Pizarro, supra,* 135 Cal.App.4th at p. 1176; *Javorsky v. Western Athletic Clubs, Inc.* (2015) 242 Cal.App.4th 1386, 1402-1403 (*Javorsky*); see also *Sargoy, supra,*

---

[4]     Candelore rightly points out that the complaint alleges only that Tinder has publicly stated the budget constraints of its younger users were one among " 'a combination of factors' " that led it to adopt the chosen price points for " 'certain age demographics.' " We agree with his contention that the allegation concerning Tinder's public statement does not preclude him from amending his complaint should discovery reveal other factors that influenced Tinder's pricing decision.

8 Cal.App.4th at pp. 1044-1045 [applying rationale to uphold bank program offering higher interest rates to seniors].) These cases have invariably relied upon dictum from our Supreme Court's opinion in *Koire*, where, in the course of holding sex-based price discounts at Ladies' Day car wash and Ladies' Night bar events violated the Act, the court observed that "[c]harging different prices to children and senior citizens is sometimes permissible and socially desirable," in part because "[c]hildren and elderly persons frequently have limited earning capacities which justify differential treatment in some circumstances." (*Koire, supra,* 40 Cal.3d at pp. 36–37.) We are mindful that the dictum of the Supreme Court, "while not controlling authority, carries persuasive weight and should be followed where it demonstrates a thorough analysis of the issue or reflects compelling logic." (*Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 297.) Nevertheless, because it conflicts with the Supreme Court's holding in *Marina Point*, which makes discrimination based on generalized assumptions about an individual's personal characteristics "arbitrary" under the Act, we decline to follow the dictum from *Koire* on this point. (See *Marina Point, supra,* 30 Cal.3d at pp. 738–740.)

Our decision to break with *Koire*'s dictum is bolstered by the fact that discounts for children and seniors are independently justified by compelling "social policy considerations as evidenced by *legislative enactments*." (*Koire, supra,* 40 Cal.3d at p. 38, italics added.) In *Koire*, the court remarked that while it "need not determine the validity of any specific age-based discount, especially without the benefit of briefing on the issue from parties actually affected by the practice," there were "several important and distinguishing features" that differentiated such practices

13

from the sex-based discounts under review. (*Id.* at p. 37.) Among those distinguishing features, the *Koire* court emphasized that "[n]umerous statutes in California provide for differential treatment of children and adults," "state and federal legislation ha[d] been enacted to address the special needs of our elderly citizens," and "the Legislature ha[d] specifically provided for certain price discounts for senior citizens." (*Id.* at pp. 37-38, citing, e.g., Civ. Code, § 1556 [limitation on minors' capacity to contract]; 42 U.S.C. § 1381 et seq. [supplemental security income for seniors]; Welf. & Inst. Code, § 12050 et seq. [senior security benefits]; former Veh. Code, § 13001 [reduced transit fares for seniors]; Ed. Code, § 89330 [waiver of fees at California State University campuses for seniors].) Indeed, although the court identified the limited earning capacities of children and seniors as an additional justification for differential treatment, that consideration too was driven by statutory enactments reflecting the Legislature's judgment to limit work opportunities for these age demographics. (*Koire,* at pp. 37-38, citing, e.g., Lab. Code, §§ 1285 et seq., 1290 & 1391 [establishing conditions and sanctions for employing minors]; Gov. Code, § 75000 et seq. [the Judges' Retirement Law].)

Although past cases have followed the *Koire* dictum in citing generalized assumptions about income disparity as grounds to uphold age-based price discounts, in most of those cases the discounts were independently justified by social policy considerations evidenced in legislative enactments. (See *Starkman, supra,* 227 Cal.App.3d at pp. 1499-1500 [citing statutes limiting child employment and providing public assistance for seniors as evidence of social policy justifying discounted movie tickets for children and seniors]; *Pizarro, supra,*

14

135 Cal.App.4th at p. 1176 [citing United States Supreme Court case discussing federal Age Discrimination in Employment Act protections for 40-to-65 age group as justification for "baby-boomer" discount];[5] see also *Sargoy, supra,* 8 Cal.App.4th at p. 1045 [statutory enactments favoring retirement established public policy justifying bank program offering higher interest rates to senior citizens]; *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1503 (*Lazar*) [because "legislative scheme . . . expressly approves the adoption of minimum age requirements by car rental companies," plaintiff could not maintain Unruh Act claim on basis of company's refusal to rent vehicles to persons under age 25].)[6] These statutory enactments, which reflect the considered judgment of a legislative body to advance certain social policy objectives by treating children and seniors differently from the rest of the public, justified the use of

---

[5]     The *Pizzaro* court also observed that providing "discounted theater admissions to 'baby-boomers' to attend a musical about that generation does not perpetuate any irrational stereotypes," thus, recognizing that the price discounts were not based on " 'some arbitrary, class-based generalization' " about the age group, but rather on the fact that the musical was about the baby-boomer generation. (*Pizarro, supra,* 135 Cal.App.4th at p. 1176.)

[6]     The trial court understandably relied upon these cases in concluding Candelore could not state a claim because there was "no basis in the published decisions for applying the Unruh Act to age-based pricing differentials." That conclusion, while consistent with these appellate authorities, failed to recognize that the cases were fundamentally different than this one because, in each, the differential treatment at issue was consonant with recognized public policies reflected in legislative enactments.

class-based criteria in those cases, without requiring the courts to engage in the sort of generalizations about age and income that run counter to the individual nature of the right secured to all persons by the Unruh Act. These cases can thus be reconciled with the Supreme Court's holding in *Marina Point*, notwithstanding their partial reliance on the incongruous dictum from *Koire*. (See *Marina Point, supra,* 30 Cal.3d at p. 742 [recognizing age-limited admission policies of retirement and senior living communities were supported by "specific 'age-conscious' legislative measures"].)

The only outlier is *Javorsky*, where the court approved a luxury health club's age-based discount for 18- to 29-year-olds, despite scant indication of a legislative policy favoring differential treatment for this age group. (*Javorsky, supra,* 242 Cal.App.4th at p. 1404.)[7] The *Javorsky* court held the age-based discount was nevertheless justified because "(1) it expands

---

[7] While concluding a supporting statutory enactment was unnecessary to uphold the discriminatory policy, the *Javorsky* court noted that "the law is not entirely bereft of indications that persons under 30 – including students and those just beginning their careers – might feel economic pressures worthy of attention and assistance as a public policy matter." (*Javorsky, supra,* 242 Cal.App.4th at p. 1404.) In support of that observation, the court cited statements made by Senator Durbin in connection with Congressional debate over extending the dependent coverage provisions of the Affordable Care Act to 24- and 25-year-olds. (*Ibid.*, citing Remarks of Sen. Durbin, 155 Cong. Rec. 32915 (2009).) Notwithstanding Senator Durbin's remarks, however, the *Javorsky* court acknowledged that "[n]o statute or published decision identifies 18 to 29 year olds in the San Francisco Bay Area as a 'financially disadvantaged' group entitled to a 'luxury' health and fitness club." (*Javorsky,* at p. 1403.)

16

access to beneficial, recreational activities; (2) it benefits an age group with limited financial resources; and (3) it does not perpetuate any invidious stereotypes." (*Id.* at p. 1401.) With respect to the second point, the plaintiff argued "[a]ge brackets [were] poor indicators of income," citing census data and other evidence offered in opposition to the health club's motion for summary judgment showing that "people age 28 have equal to or greater median income than people ages 33, 35, 41, 44, 46, 47, 49, and 51 to 89." (*Id.* at p. 1403.) The *Javorsky* court rejected the argument, responding that the Unruh Act required only a showing that "persons ages 18 to 29, *as a group*, have less income than persons age 30 and over" to demonstrate the discriminatory practice was "not arbitrary."[8] (*Ibid.*, italics added.) Respectfully, we find that reasoning to be inconsistent with the "individual nature" of the right secured by the Unruh Act, which protects individuals from unequal treatment based on generalizations

---

[8] The *Javorsky* court also remarked that the plaintiff's argument, if accepted, "would obliterate all age-based discounts – including those upheld in *Starkman* and *Pizarro* – since all age groups include persons with higher incomes and persons with lower incomes." (*Javorsky, supra,* 242 Cal.App.4th at p. 1403.) That conclusion ignores the fact that the age-based discounts in *Starkman* and *Pizarro* were independently justified by compelling social policy considerations as evidenced by legislative enactments – a justification which, as discussed, has been present in all cases upholding age-based business practices, except *Javorsky*. (See *Starkman, supra,* 227 Cal.App.3d at pp. 1499-1500; *Pizarro, supra,* 135 Cal.App.4th at pp. 1175-1176; *Sargoy, supra,* 8 Cal.App.4th at p. 1045; *Lazar, supra,* 69 Cal.App.4th at p. 1503.)

17

about "a group" to which they belong.[9] (*Marina Point, supra,* 30 Cal.3d at p. 739-740; *Koire, supra,* 40 Cal.3d at pp. 35-36.)

The danger of using age as a proxy for income to justify age-discriminatory pricing becomes more apparent when one acknowledges that such pricing operates not merely as a "discount" for the favored age group, but effectively as a *surcharge* on the disfavored one. (See *Koire, supra,* 40 Cal.3d at p. 34 ["plaintiff *was* adversely affected by the price discounts" insofar as "he had to pay more than any woman customer, based solely on his sex"].) Were Tinder's justification sufficient, generalizations about the relative incomes of different age groups could be employed to rationalize higher prices for all consumers 30 and older in even the most essential areas of commerce – such as grocery shopping, gasoline purchases, etc. – even in instances where an individual did not in fact enjoy the economic advantages that are presumed about his or her age group as a whole. (See *Marina Point, supra,* 30 Cal.3d at p. 739 [warning that Unruh would be "drastically undermined" if class-based discrimination could be justified simply because a business had

---

[9] Tinder filed a request asking this court to take judicial notice of (1) several charts published by the United States Census Bureau regarding " 'Selected Characteristics of People 15 Years Old and Over by Total Money Income,' " and (2) a declaration offered by the defendant's expert in *Javorsky,* purporting to analyze census data regarding the financial resources of different age demographics in California. Because we conclude group data about income by age demographic is insufficient to justify the alleged discrimination, we deny Tinder's request for judicial notice. (See *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 ["any matter to be judicially noticed must be relevant to a material issue"].)

18

"reason to believe that the class, taken as a whole, might present greater problems than other groups"].) It is inconceivable that an antidiscrimination law like the Unruh Act would countenance a grocer charging an unemployed 31-year-old patron twice as much as an employed 28-year-old customer merely on the basis of market testing showing that those over the age of 30 "as a group" generally earn more than 18- to 29-year-olds. Nor have the parties identified any legislative pronouncements that would justify such a departure from the Unruh Act's language and provenance. Insofar as the Act entitles individuals to "full and equal accommodations, advantages, facilities, privileges, or services in *all business establishments of every kind whatsoever*" (§ 51, subd. (b), italics added), it follows that the same analysis must apply evenly to arguably less essential commercial services, such as premium features of an online dating app or luxury health club memberships.

Consistent with *Marina Point*, we conclude Tinder's alleged discriminatory pricing model cannot be justified by a generalization about the relative incomes and budget limitations of the two implicated age groups. We turn now to whether the public policies cited by the trial court compelled the finding that Tinder's alleged discrimination was justified, as a matter of law.

     3.    *The Complaint's Allegations Do Not Compel the Finding that Public Policy Justifies Tinder's Age-based Classification*

In sustaining the demurrer, the trial court concluded Tinder's alleged age-based pricing model was justified by " 'public policies' " that promote "(a) increased access to services for the general public and (b) profit maximization by the vendor, a legitimate goal in our capitalistic economy." Similar justifications

19

were rejected by the Supreme Court in *Koire* when advanced by the bar owner in defense of its Ladies' Nights discounts. Further, while our Supreme Court recognized in *Harris* that vendors may pursue legitimate business interests by making *economic* distinctions among customers, it held such distinctions were permissible because they employed criteria that could conceivably be met by any customer, regardless of the customer's personal characteristics. (*Harris, supra,* 52 Cal.3d at p. 1163.) The Supreme Court's holdings in *Koire* and *Harris* control our resolution of this issue.

Drawing on its prior holding in *Marina Point*, our Supreme Court in *Koire* explained that an otherwise prohibited "discriminatory practice" will be upheld as reasonable, and therefore not arbitrary, "when there is a strong public policy in favor of such treatment." (*Koire, supra,* 40 Cal.3d at p. 31, citing *Marina Point, supra,* 30 Cal.3d at pp. 742-743.) The *Koire* court continued: "Public policy may be gleaned by reviewing other statutory enactments. For example, it is permissible to exclude children from bars or adult bookstores because it is illegal to serve alcoholic beverages or to distribute ' "harmful matter" ' to minors. [Citations.] This sort of discrimination is not arbitrary because it is based on a 'compelling societal interest' [citation] and does not violate the Act." (*Koire,* at p. 31, citing *Marina Point,* at p. 743.)

In *Koire*, the Supreme Court rejected the argument that increasing patronage among women at Ladies' Day carwash events and Ladies' Night bar events was a sufficiently compelling societal interest to justify discriminatory sex-based pricing. (*Koire, supra,* 40 Cal.3d at p. 33.) The court reasoned that the asserted objective was "a far cry from the social policies which

20

have justified other exceptions to the Unruh Act," like the "compelling societal interest in ensuring adequate housing for the elderly which justifies differential treatment based on age." (*Ibid.*) The same analysis holds with respect Tinder's purported objective here. Unlike children's and senior's discounts, which are justified by compelling societal interests that can be "gleaned [from] statutory enactments" (*id.* at p. 31), whatever interest society may have – if any – in increasing patronage among those under the age of 30 who may be interested in the premium features of an online dating app, that interest is not sufficiently compelling to justify discriminatory age-based pricing that may well exclude less economically advantaged individuals over the age of 30 from enjoying the same premium features.

As for profit maximization, we have no quarrel with the trial court's conclusion that it can be an acceptable business objective and can be advanced by price discrimination. As anyone who has attended an auction can attest, individuals may and often do value goods and services differently. Some are willing and able to pay a higher price than others for the same product. And, as any student of elementary microeconomics knows, sellers of goods and services could (at least theoretically) maximize profits if they could engage in price discrimination by charging higher prices to those consumers willing to pay them, and lower prices to the rest. For example, a seller might offer several versions of its product, with different features, trim, branding, etc., each at a different price, in an effort to increase overall profits. Or a seller might seek to attract bargain hunters by offering temporary price reductions during a sale or other promotion. But the quest for profit maximization can never serve

as an excuse for prohibited discrimination among potential customers.

The *Koire* court made this point emphatically. It directly addressed and rejected the contention that a merchant's interest in profit maximization could justify discriminatory sex-based pricing, relying again on its prior holding in *Marina Point.* The *Koire* court explained:

> "In *Marina Point*, this court held that the fact that a business enterprise was ' "proceed[ing] from a motive of rational self-interest" ' did *not* justify discrimination. [Citation.] This court noted that 'an entrepreneur may pursue many discriminatory practices "from a motive of rational self-interest," e.g., economic gain, which would unquestionably violate the Unruh Act. For example, an entrepreneur may find it economically advantageous to exclude all homosexuals, or alternatively all nonhomosexuals, from his restaurant or hotel, but such a "rational" economic motive would not, of course, validate the practice.' [Citation.] It would be no less a violation of the Act for an entrepreneur to charge all homosexuals, or all nonhomosexuals, reduced rates in his or her restaurant or hotel in order to encourage one group's patronage and, thereby, increase profits. The same reasoning is applicable here, where reduced rates were offered to women and not men."

(*Koire, supra,* 40 Cal.3d at p. 32.) And, the same reasoning is likewise applicable here, where Tinder allegedly offers reduced rates to those under the age of 30, but not individuals who are 30 or older.

Recognizing that a business's interest in maximizing profits is insufficient to justify discrimination based on an individual's *personal characteristics* does not preclude a business like Tinder from employing rational *economic* distinctions to broaden its user base and increase profitability. (See *Harris, supra,* 52 Cal.3d at p. 1163.) But, as *Koire* and *Harris* teach, those distinctions must be drawn in such a way that they could conceivably be met by any customer, regardless of the customer's age or other personal characteristics. (See *Koire, supra,* 40 Cal.3d at p. 36; *Harris,* at p. 1163.) For instance, Tinder could establish different membership levels for its Tinder Plus service that would allow more budget constrained customers, regardless of age, to access certain premium features at a lower price, while offering additional features to those less budget conscious users who are willing to pay more. Tinder could also offer discounts for purchasing several months of Tinder Plus in advance that would likewise allow budget constrained users cheaper access to its premium features, without arbitrarily discriminating against older users on the basis of age. "The key," as our Supreme Court put it in *Koire*, "is that the discounts must be 'applicable alike to persons of every sex, color, race, [and age, etc.]' (§ 51), instead of being contingent on some arbitrary, class-based generalization." (*Koire,* at p. 36; accord *Harris,* at p. 1163 ["discounts based on quantity, advance reservations, time of purchase or other conditions 'which any patron could satisfy' [are] 'clearly permissible' "].)

As alleged, Tinder's pricing model discriminates against users age 30 and over, and the complaint's allegations do not compel the finding that this discrimination is justified by a strong public policy in favor of such differential treatment. While we

23

make no judgment about the true character of Tinder's pricing model, or whether evidence exists to establish a sufficient justification for charging older users more than younger users, we conclude the complaint's allegations are sufficient to state a claim for age discrimination in violation of the Unruh Act. The trial court erred in sustaining Tinder's demurrer to the Unruh Act claim.

4. *The Complaint States a Claim for Violation of the UCL*

The UCL prohibits, and provides civil remedies for, "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) Its purpose " 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' [Citations.] In service of that purpose, the Legislature framed the UCL's substantive provisions in ' "broad sweeping language" ' [citations] and provided 'courts with broad equitable powers to remedy violations' [citation]." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320.)

The UCL's "unlawful" prong "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." (*Lazar, supra,* 69 Cal.App.4th at p. 1505.) " '[V]irtually any law or regulation – federal or state, statutory or common law – can serve as [a] predicate for [an] . . . "unlawful" [prong] violation.' " (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 681.) Because we conclude the complaint adequately states a claim for violation of the Unruh Act, we also conclude the allegations are sufficient to state a claim under the "unlawful" prong of the UCL. (See *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1384.)

24

Further, in view of our conclusion that Tinder's alleged discriminatory pricing model violates the public policy embodied in the Unruh Act, the UCL's "unfair" prong provides an independent basis for relief on the facts alleged. The standard for finding an "unfair" practice in a consumer action is " 'intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.] The test of whether a business practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]" . . . [A]n "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [Citation.]' " (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718-719; accord *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 539.)

As discussed, the Unruh Act protects "all persons" from status-based discriminatory business practices that operate to deprive innocent individuals of "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b); *Marina Point, supra,* 30 Cal.3d at p. 740.) Insofar as the complaint sufficiently alleges a violation of the Act and the public policy it embodies, a claim for violation of the UCL has also been stated.

**DISPOSITION**

The judgment is reversed. Candelore is entitled to his costs.

**CERTIFIED FOR PUBLICATION**

CURREY, J.[*]

We concur:

EDMON, P. J.

LAVIN, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.