Filed 9/29/21  Chodniewicz v. ART.com CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOSHUA CHODNIEWICZ, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>ART.COM, INC., et al.,<br><br>    Defendants and Respondents. | A159720<br><br>(Alameda County<br>Super. Ct. No. RG19001604) |

Plaintiffs are shareholders of ART.com, Inc. (ART) who brought suit against four of ART's directors and the venture capital firms they control, alleging that the board of directors breached their fiduciary duties to ART in approving the sale of ART to Walmart, Inc. (Walmart), and that the venture capital firms aided and abetted those breaches.  The trial court sustained the venture capital firms' demurrer to the operative complaint's second cause of action for aiding and abetting breach of fiduciary duty, and dismissed the venture capital firms from the case, concluding that plaintiffs failed to allege "knowing participation" in the alleged breaches as required under Delaware law.  Our review leads to the opposite conclusion, and we reverse.

1

# BACKGROUND[1]

## The Parties

Plaintiffs and appellants Joshua Chodniewicz and Michael Marston are the founders of defendant and respondent ART, a Delaware corporation with its principal place of business in Emeryville, California, that was at one time one of the world's largest online sellers of artwork. Plaintiffs are also shareholders of ART, and Chodniewicz serves on ART's board, alongside six other directors: Dan Marriott (the chairman), Robert Kagle, David Quinlivan, Alan Spoon, Kira Wampler (the CEO), and Sharon McCollam.

Four of ART's directors (the VC Directors) are also affiliated with venture capital firms (the VC Stockholders) who hold common and/or preferred stock in ART, specifically: Marriott is managing member of SG Growth Partners I, L.P.; Kagle is a general partner of Benchmark Capital Partners IV, L.P., and Benchmark Capital Partners V, L.P.; Quinlivan is managing member of each of the limited liability companies that control Saints Capital VI, L.P. and Saints Ventures II, L.P.; and Spoon is partner emeritus of Polaris Venture Partners IV, L.P. and Polaris Venture Partners Entrepreneurs' Fund IV, L.P.

## The Walmart Transaction

In the first quarter of 2018, ART's CEO Wampler and CFO Chuck Kurth began to advise ART's board of directors to explore a sale of ART. According to the May 29, 2018 board minutes, "the Board authorized the Company's officers to continue discussions with . . . third parties and to seek to elicit written acquisition offers from such parties." And as early as March

---

[1] The factual background is drawn from the allegations of the operative Third Amended Complaint.

2018, ART began supplying Walmart with confidential information related to a potential sale.

On October 29, Walmart sent ART a letter of intent proposing that Walmart acquire ART's selected U.S. assets for a purchase price of $40,000,000, leaving ART with its international operations and all its liabilities. The proceeds from the transaction were "to be used to pay creditors in full, leaving between $8,000,000–$10,000,000 for Management bonuses, Management severance payments, and distributions to VC Stockholders, yet distributing nothing to holders of common stock." The letter of intent gave ART 24 hours to decide whether to accept its terms. It also contained a "no-shop" restriction, preventing the board from entertaining any other offers for the sale of ART, and a "no-talk" provision, preventing the board from entertaining unsolicited offers to purchase ART.

The next day, over Chodniewicz's objection, the board voted to accept the terms of the letter of intent.

Chodniewicz proposed an alternative to the Walmart transaction that "would remove inept management, cut unnecessary expenses, and restore ART to health." Through "causal conversations" with "only a few other shareholders, [Chodniewicz] obtained millions of dollars in financial commitments to fund" this alternative transaction, including $1,800,000 from the board's chairman, Marriott. Chodniewicz obtained a written letter of intent from Clinton Phillips, a wealthy entrepreneur, who offered to infuse $15,000,000 into ART. He also spoke with Jason Caplain, who offered an additional $2,000,000 on the condition that Chodniewicz assume control of the company.

By December 5, Walmart had presented ART an asset purchase agreement, which was considered at a meeting of the board on December 5.

3

Again over Chodniewicz's objection, the board approved the Walmart transaction. The board allegedly did so because the directors "feared that creditors could sue the Board if they accepted anything other than the WALMART transaction," and because they "believed they owed their fiduciary duties to ART's creditors, and these fictitious duties to creditors would be violated, thus creating liability for themselves, if the WALMART fire sale was not accepted."

Together with the board's approval, the VC Directors each executed a written consent to the Walmart transaction, "giving written consent with respect to all shares of the Company's capital stock by such Stockholder in favor" of the transaction. On December 11, ART's CEO Wampler sent a notice to ART's shareholders regarding the transaction, stating that ART "expects that substantially all or all of the proceeds will be used to pay its creditors. If any proceeds remain and the Company winds down its operations, the Company may make a modest distribution to the holders of Series B Preferred Stock, but it is expected that no proceeds will be available to make any distributions to the holders of Series A Preferred Stock, Series A-1 Preferred Stock or Common Stock."

**The Lawsuit**

On January 7, 2019, plaintiffs Chodniewicz and Marston filed suit against ART, the individual members of the board of directors, and Walmart, alleging breach of fiduciary duty, breach of Delaware General Corporation Law section 124, aiding and abetting breach of fiduciary duty against Walmart, fraud and constructive fraud, and seeking declaratory relief. Plaintiffs sought a temporary restraining order and an injunction blocking the closing of the Walmart transaction. The trial court denied the request for injunctive relief.

On February 14, plaintiffs filed a First Amended Complaint, now including the VC Stockholders as defendants. The trial court sustained Walmart's demurrer to the First Amended Complaint with leave to amend, concluding that the "no-shop" provision and sale price of the Walmart transaction were not per se breaches of the board of directors' fiduciary duties.

On June 12, plaintiffs filed a Second Amended Complaint. The second cause of action was for breach of fiduciary duty against the VC Stockholders, alleging that they "control[led] ART not only because of their shareholdings, which combined equals a 'majority' controlling interest, but also because of their control over the Board, which they dominate[d] thus giving them such formidable voting and managerial power that they control[led] the business of ART," and that the breaches of fiduciary duty by ART's directors were "accomplished at the behest and direction" of the VC Stockholders.

The VC Stockholders filed a demurrer to the second cause of action, and the trial court sustained the demurrer with leave to amend, holding as follows:

"As the Second Amended Complaint is currently pled (at paragraph 129), Plaintiffs appear to allege that the VC Stockholders are vicariously liable for purported breaches of fiduciary duties by members of the VC Stockholders who sit on the Art.com board. That is not a viable theory of liability. (See, e.g., *Khanna v. McMinn* (Del. Ch. May 9, 2006) 2006 WL 1388744.) Plaintiffs are given leave to amend to make clear that they are proceeding on their breach of fiduciary duty claims against the VC Stockholders under an aiding and abetting theory, and to allege facts in support of that theory."

On October 7, 2019, plaintiffs filed the operative Third Amended Complaint (TAC), alleging five causes of action: (1) breach of fiduciary duty against the VC Directors as well as Wampler and Kurth; (2) breach of fiduciary duty and aiding and abetting breach of fiduciary duty against the VC Stockholders; (3) aiding and abetting breach of fiduciary duty against Walmart; (4) constructive trust, disgorgement, and unjust enrichment against Walmart; and (5) declaratory relief against all defendants.

With respect to the second cause of action against the VC Stockholders, the TAC alleged that "[e]ach of the . . . VC Stockholders control the business and affairs of ART in so far as the WMT Transaction is concerned," that they "control ART not only because of their shareholdings, which combined equals a 'majority' controlling interest, but also because of their control over the Board, which they dominate," and thus they constituted a "control group" analogous to a controlling shareholder, and therefore owed a fiduciary duty to their fellow shareholders; and that they acted "in concert to accomplish the joint purpose of controlling ART in general and in particular in approving the WALMART transaction." The TAC also alleged that the VC Directors "were agents of and made decisions for their respective VC Stockholder," such that the knowledge of the VC Directors was imputed to the VC Stockholders and they therefore aided and abetted the VC Directors' alleged breaches of fiduciary duty. And, the TAC alleged, that "acting as a single group the VC Directors and VC Stockholders planned and caused ART to engage in the WMT Transaction that had the purpose and effect of gaining their personal release from creditor claims, and did so at the expense of the minority shareholders of ART. Through a series of meetings and agreements they worked together to establish the exact terms and timing of the WMT Transaction."

6

**The Demurrers and The Trial Court's Ruling**

The VC Directors, Walmart, and the VC Stockholders filed separate demurrers to the TAC. The trial court overruled the demurrers of the VC Directors and Walmart to the first, third, fourth, and fifth causes of action, concluding that the TAC sufficiently alleged a breach of fiduciary duty by Walmart and by the VC Directors. However, the trial court sustained the VC Stockholders' demurrer to the second cause of action without leave to amend, concluding that plaintiffs had failed to allege that the VC Stockholders constituted a control group and thereby owed a fiduciary duty to minority shareholders. With respect to the aiding and abetting allegations, the trial court held as follows:

"Second, Plaintiffs alleged that the VC Stockholders are liable for aiding and abetting the breach of fiduciary duties by ART's directors. This claim is based on the fact that certain of ART's board of directors were also members of the VC Stockholders, and that those directors were managing members of the VC Stockholders who made the decisions for those entities. (See Third Amended Complaint, paragraphs 127–128 and 138–140.) A shareholder is not vicariously liable for an alleged breach of fiduciary duty by one of its members. (See, e.g., *Khanna v. McMinn*[, *supra*,] 2006 WL 1388744.) Plaintiffs argue, however, that a shareholder may be liable for a breach of fiduciary duty by an affiliated corporate director who controls the shareholder and/or occupies a sufficiently high position in the shareholder such that the director's knowledge is imputed to the shareholder. (See, e.g., *In re PLX Technologies Inc. Stockholders Litig.* (Del. Ch. Oct. 16, 2018) 2018 WL 5018535, at p. *107 (*PLX*).)

"But Plaintiffs' focus on whether the knowledge of an affiliated corporate director can be imputed to the shareholder misses the key point,

7

i.e., that a claim for breach of fiduciary duty requires not just knowledge, but 'knowing participation' by the shareholder.  Plaintiffs must allege facts demonstrating that the VC Stockholders knowingly participated in the purported breach of fiduciary duties by ART's board of directors by providing 'substantial assistance' to the breach.  (See e.g., *Buttonwood Tree Value Partners L.P. v. R.L. Polk & Co.* (Del. Ch. July 24, 2017) 2017 WL 3172722, at p. *9, and *Malpiede v. Townson* (Del. 2001) 780 A.2d 1075, 1096.)  Here, Plaintiffs fail to allege facts demonstrating that any of the VC Stockholders took any action that substantially assisted in the purported breach of fiduciary duties by ART's board.  [Citation.]  Rather, as discussed above, Plaintiffs simply allege that each of the VC Stockholders voted in favor of the asset sale to Walmart, pursuant to their rights under ART's Certificate of Incorporation.

"To the extent Plaintiffs contend the VC Stockholders are themselves liable for alleged breaches of fiduciary duties by their affiliated directors, Plaintiffs are seeking to hold the VC Stockholders vicariously liable for the actions of their affiliated directors.  That is not a viable theory of liability."

The trial court also sustained the VC Stockholders' demurrer to the fifth cause of action for declaratory relief, finding that they did not owe an independent fiduciary duty to the plaintiffs.  The trial court then dismissed the VC Stockholders from the action with prejudice.

Plaintiffs filed a notice of appeal.

## DISCUSSION

Plaintiffs argue that the trial court erred in sustaining the VC Stockholders' demurrer to the second cause of action because they sufficiently pled the elements of aiding and abetting a breach of fiduciary duty or, in the alternative, that they sufficiently alleged that the VC Stockholders acted as a

8

"control group" in approving the transaction and therefore owed fiduciary duties to the minority shareholders, and that they should have been granted leave to amend to cure any deficiencies in the TAC. We agree with plaintiffs' first argument, and need not reach the second.

**Applicable Law: Demurrer**

On appeal from a dismissal after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment whether the complaint states a cause of action as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125; *Chen v. PayPal, Inc.* (2021) 61 Cal.App.5th 559, 568.) We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; see *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967.) We deem to be true all material facts properly pled (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591), and also accept as true those facts that may be implied or inferred from those expressly alleged. (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 264.) And we "adopt[] a liberal construction of the pleading and draw[] all reasonable inferences in favor of the asserted claims." (*Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, 1143.)

**Applicable Law: Aiding and Abetting Breach of Fiduciary Duty**

In *PLX*, *supra*, 2018 WL 5018535, the Delaware Court of Chancery gave the following exposition of Delaware law on aiding and abetting a breach of fiduciary duty:

A claim "for aiding and abetting breaches of fiduciary duty . . . has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by a non-fiduciary

9

defendant, and (iv) damages proximately caused by the breach." (*Id*. at p. *27.)

We briefly interrupt the *PLX* description to note that, as the VC Stockholders acknowledge, the only element in dispute here is the third, knowing participation. And as to this, *PLX* continues: "The third element of a claim for aiding and abetting is the third party's knowing participation in the breach. 'The adjective "knowing" modifies the concept of "participation," not breach.' The underlying wrong does not have to be knowing or intentional; it can be a breach of the duty of care.

"Under 876(b) of the Restatement (Second) of Torts, knowing participation exists when a third party:

"(a) does a tortious act in concert with the other or pursuant to a common design with him, or

"(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

"(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

"For purposes of a board decision, the requirement of participation can be established if the third party 'participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue.' In particular, a third party can be liable for aiding and abetting a breach of the duty of care if the third party 'purposely induced the breach of the duty of care . . . .' The method of facilitating the breach can include 'creating the informational vacuum' in which the board breaches its duty of care.

"When the aiding and abetting claim targets an unrelated third party, a court's analysis of whether a secondary actor 'knowingly participated' is necessarily fact intensive.  Illustrative factors include the following:

"・ The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects;

"・ The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;

"・ The nature of the relationship between the secondary and primary actors; and

"・ The secondary actor's state of mind.

"When the fiduciary and primary wrongdoer is also a representative of the secondary actor who either controls the actor or who occupies a sufficiently high position that his knowledge is imputed to the secondary actor, then the test is easier to satisfy.  For example, this court has recognized that the acquisition vehicles that a controlling stockholder uses to effectuate an unfair freeze-out merger are liable as aiders and abettors to the same degree as the controller, because the controller's knowledge is imputed to those entities.  [See *In re Dole Food Co., Inc. Stockholder Litigation* (Del. Ch. Aug. 27, 2015) 2015 WL 5052214, at p. *39; *In re Emerging Communications, Inc. Shareholders Litigation* (Del. Ch. May 3, 2004) 2004 WL 1305745, at p. *38.]  This court also has employed the same reasoning to recognize that an investment fund can be liable for aiding and abetting when 'the same individuals who have made the Fund's investment decisions' are also the fiduciaries who engaged in misconduct.  [*Forsythe v. ESC Fund Mgmt. Co.*, (Del. Ch. Oct. 9, 2007) 2007 WL 2982247, at p. *13 ['These investment decisions form the basis of the plaintiffs' breach of fiduciary duty

11

claims. Therefore, the court may infer CIBC's knowledge of the Special Limited Partner's and Investment Advisor's breaches of fiduciary duty'].]" (*PLX, supra*, 2018 WL 5018535, at p. *47, fns. omitted.)

**The Parties' Arguments**

Plaintiffs argue that where there is a "close identity between a director who is breaching his fiduciary duties and the shareholder entity he controls or manages," Delaware law imputes the "knowing participation" element of aiding and abetting to the shareholder entity and does not require a separate allegation of "substantial assistance." In support, they cite numerous cases that have found knowing participation in similar circumstances, cases we discuss below. In the alternative, Plaintiffs argue that the TAC pleaded "substantial assistance" by alleging that the VC Stockholders signed the written consent and thereby approved the Walmart transaction.

The VC Stockholders argue that the "element of 'knowing participation' requires that the secondary actor have provided 'substantial assistance' to the primary violator," even in cases where the director also controls the shareholder, and that that element was not sufficiently alleged here. And in claimed support they cite: "(See *In re Oracle Corporation Derivative Litigation* (Del. Ch. June 22, 2020) 2020 WL 3410745, at p. *11 [plaintiff 'must plead facts making it reasonably conceivable that the defendant knowingly supported a breach of duty *and* that his resulting assistance to the primary actor constituted substantial assistance in causing the breach'].)" The VC Stockholders argue that in considering whether knowing participation has been alleged, Delaware courts look to whether the defendants acted with "improper motives of their own." (*Goodwin v. Live Entertainment, Inc.* (Del. Ch. Jan. 25, 1999) 1999 WL 64265, at p. *28; see *In re Comverge, Inc.* (Del. Ch. Nov. 25, 2014) 2014 WL 6686570, at p. *18.)

12

Finally, they argue that finding the knowing participation element alleged here would contravene Delaware law's rejection of the proposition that "whenever a director is affiliated with a significant stockholder, that stockholder automatically would acquire the fiduciary obligations of the director by reason of that affiliation alone." (*Emerson Radio Corp. v. International Jensen Inc.* (Del. Ch. Aug. 20, 1996) 1996 WL 483086, at p. *20, fn. 18.)

We agree with plaintiffs. But before explaining why, we begin with discussion of several Delaware cases that have held for plaintiffs on the issue of knowing participation—indeed, two cases that found knowing participation after trial.[2]

### *PLX*

In *PLX*, *supra*, 2018 WL 5018535, Potomac Capital Partners, a shareholder of PLX, launched an "activist campaign" to pressure PLX into selling itself, a campaign led by Potomac's co-managing member, Singer. (*PLX*, *supra*, 2018 WL 5018535, at p. *1.) Potomac nominated five candidates, including Singer, to replace a majority of PLX's board. (*Ibid.*) Singer then received a tip from Krause, a representative of Avago, a potential purchaser, informing him what Avago wanted to pay for PLX and when it was likely to bid, but he did not share this information with the rest of PLX's board. (*Id*. at p. *1.) After Avago ultimately purchased PLX, plaintiffs sued the board of directors for breaching their fiduciary duties in approving the merger, and sued Potomac for aiding and abetting those breaches. (*Id*. at p. *2.) In a post-trial decision, the Delaware Court of Chancery found that plaintiffs had proved Potomac's "knowing participation":

---

[2] Although these decisions are unpublished, they have precedential effect in Delaware. (See *Aprahamian v. HBO & Co.* (Del. Ch. 1987) 531 A.2d 1204, 1207.)

"In this case, Singer was a co-managing member of Potomac and its agent, and his knowledge is imputed to Potomac in those capacities. Singer led Potomac's activist campaign at PLX. Potomac owned PLX stock, filed Schedule 13Ds, served books and records demands, nominated the dissident director slate, filed the proxy materials, and stood to collect the short-term gains from a quick sale. Singer directed Potomac's activities and once elected to the Board, Singer continued to act on Potomac's behalf. By failing to share Krause's tip with the Board, Singer created a critical informational gap that contributed to the Board's breach of duty.

"Because of Singer's relationship with Potomac and his role in directing and implementing Potomac's strategy, Singer's knowledge and actions can be attributed to Potomac. This holding does not stand for the proposition that the actions of the director-representative of a stockholder can always be attributed to a stockholder. For example, Delaware law does not recognize any basis to attribute the actions of an independent director to the control of the stockholder that nominated or appointed him, simply by virtue of the fact of the nomination or appointment. In this case, the combination of Singer's position with, ties to, and actions on behalf of Potomac supports a different result and warrants a finding that Potomac knowingly participated in the steps Singer took to breach his fiduciary duties and induce a breach by the Company's other directors. The plaintiffs thus satisfied the third element of their claim for aiding and abetting a breach of fiduciary duty." (*PLX*, *supra*, 2018 WL 5018535, at pp. *49–*50, fns. omitted.)

### *Emerging*

In *In re Emerging Communications, Inc. Shareholders Litigation* (Del. Ch. May 3, 2004) 2004 WL 1305745 (*Emerging*), Prosser was ECM's Chairman and CEO, and also the owner of ICC, which owned 100 percent of

Innovative and 52 percent of ECM. (*Id*. at p. *1.) Plaintiffs, including an investment fund named Greenlight, challenged a privatization transaction in which Innovative acquired the publicly owned shares of ECM, alleging that Prosser had breached his fiduciary duties to ECM. (*Ibid*.) After trial, the court concluded that Innovative and ICC were liable for aiding and abetting Prosser's breaches:

"Prosser, as majority stockholder, breached his duty of loyalty to Greenlight and the plaintiff shareholder class, by eliminating ECM's minority stockholders for an unfair price in an unfair transaction that afforded the minority no procedural protections. For that breach of duty Prosser is liable to Greenlight and the shareholder class. So also are the two Prosser-controlled entity defendants, Innovative and ICC, which were the mechanisms through which Prosser accomplished the Privatization. Those entities are liable for having aided and abetted Prosser's breach of fiduciary duty. [Citations.] One of the requirements for 'aiding and abetting' liability is the third party's 'knowing participation' in the directors' breach of fiduciary duty. In that case, Prosser's knowledge must be attributed to the entities that he controlled and used to effectuate his breaches of duty." (*Emerging*, *supra*, 2004 WL 1305745, at p. *38, fn. 176.)

### *Forsythe*

In *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.* (Del. Ch. Oct. 9, 2007) 2007 WL 2982247 (*Forsythe*), a bank (CIBC) gave certain of its employees partnership interests in a fund intended to co-invest with the bank in its proprietary investments. (*Id*. at p. *1.) Plaintiffs sued the fund, its individual directors, an investment advisor, and a special limited partner for breach of fiduciary duty, in a pleading described by the court this way:

15

"According to the complaint, these CIBC senior executives, sitting as the CIBC Investment Committee, make and continue to make investment decisions for CIBC. When investments lose significant value, these same executives change hats and, sitting as the Special Limited Partner or the Investment Advisor, allegedly approve the Fund's purchase of the same investments from CIBC. The plaintiffs allege the Fund is forced to buy these investments from CIBC at prices equal to CIBC's original cost of investment and pay CIBC a 7 [percent] finder's fee. The complaint alleges that CIBC, the Special Limited Partner, and the Investment Advisor have violated and continue to violate their fiduciary duties to the Fund through this activity.

"At the same time, the plaintiffs allege that the General Partner and the Individual Defendants have violated their fiduciary duties to the Fund by abdicating their oversight responsibilities, '[n]ever once question[ing] either the Special Limited Partner, the Investment Advisor, or any other person or entity regarding the investments being made or transferred to the Fund.' The plaintiffs further allege that the Investment Advisor, Special Limited Partner, and CIBC have aided and abetted the General Partner's and the Individual Defendants' violations of their fiduciary duties." (*Forsythe*, *supra*, 2007 WL 2982247, at pp. *3–*4, fn. omitted.)

The court concluded that plaintiffs had adequately alleged that CIBC aided and abetted the breaches of the investment advisor and the special limited partner: "CIBC created the Fund and populated the Fund's decision-making entities with CIBC's own employees. Thus, the same individuals who have made the Fund's investment decisions are also high-level CIBC executives. These investment decisions form the basis of the plaintiffs' breach of fiduciary duty claims. Therefore, the court may infer CIBC's

16

knowledge of the Special Limited Partner's and Investment Advisor's breaches of fiduciary duty." (*Forsythe, supra*, 2007 WL 2982247, at p. *13.)

### *Khanna*

In *Khanna v. McMinn* (Del. Ch. 2006) 2006 WL 1388744 (*Khanna*), Shapero was managing and general partner of Crosspoint Venture Partners, L.P., a large shareholder of Covad Communications Group, Inc., and served as Crosspoint's designee to Covad's board of directors. (*Id.* at pp. *1, *3.) Plaintiffs alleged that Crosspoint aided and abetted Shapero's breaches of fiduciary duty with respect to certain transactions entered into by Covad, including Covad's acquisition of BlueStar. (*Id.* at pp. *2, *10.) The court concluded that plaintiffs had adequately alleged knowing participation:

"As to the requirement that there be 'knowing participation' in the breach by the non-fiduciary defendant (i.e., Crosspoint), '[a] claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred.' Shapero's status as a Covad director and General and Managing Partner of Crosspoint is sufficient to impute knowledge of Shapero's conduct with respect to the BlueStar acquisition to Crosspoint, for purposes of this motion to dismiss. The allegations of the Amended Complaint support the reasonable inference that Shapero, and therefore Crosspoint, knew of BlueStar's gloomy business prospects at the same time he was touting the potential acquisition." (*Khanna, supra*, 2006 WL 1388744, at p. *27, fns. omitted.)

### *Carr*

In *Carr v. New Enterprise Associates, Inc.* (Del. Ch. 2018) 2018 WL 1472336 (*Carr*), plaintiffs challenged an issuance of preferred stock by the company ACT, over 90 percent of which was acquired by defendant NEA,

17

allowing it to become ACT's controlling shareholder. (*Id*. at p. *3.) Plaintiffs alleged that the transaction undervalued ACT, and that ACT's board of directors breached their fiduciary duties. (*Id*. at p. *6.) The court concluded that plaintiffs had adequately alleged that NEA aided and abetted the board of directors' breaches, because defendant Klein was both a director of ACT and a partner on NEA's healthcare team:

"Viewing the facts alleged in the light most favorable to Carr, as I must at this stage of the proceedings, I find that Carr has adequately pled that NEA knowingly participated in the Board's breach. Klein served as both an ACT director and an NEA partner, so his alleged knowing participation in the Board's breach of its fiduciary duty with respect to the Series A–2 Financing may be imputed to NEA. The Complaint alleges that both NEA and Klein had a financial incentive to dilute cheaply ACT stockholders to gain control of the Company at an unfairly low price, and that NEA exploited conflicts of interest on the Board by deploying Klein to facilitate a transaction purportedly unfair to the existing ACT stockholders. These interactions between ACT and NEA, which acquired 90 [percent] of the Series A–2 Preferred Stock, 'amount to more than simple arm's-length negotiations,' since Klein's venture capital firm, where he is a partner, wanted NEA to acquire the preferred stock at the lowest possible valuation. Accordingly, I find it reasonably conceivable that NEA aided and abetted the Board's breach of fiduciary duty." (*Id*. at p. *16, fns. omitted.)

### *BrandRep*

In *BrandRep, LLC v. Ruskey* (Del. Ch. 2019) 2019 WL 117768 (*BrandRep*), defendant director Ruskey allegedly stole BrandRep's trade secrets and transferred them to two entities he controlled (the Entity Defendants), and those defendants then "allegedly concealed their use of

18

BrandRep's software." (*Id*. at pp. *2, *6.) The court concluded that the complaint adequately alleged an aiding and abetting claim against the Entity Defendants:

"I conclude it is reasonably conceivable that Ruskey owned or controlled the Entity Defendants, such that his knowledge of his alleged breaches of fiduciary duties owed to BrandRep is imputed to both Entity Defendants. Because Ruskey was 'the fiduciary and primary wrongdoer' and also allegedly 'control[led] [the Entity Defendants] or [ ] occupie[d] a sufficiently high position that his knowledge is imputed to' those entities, the knowing participation test is 'easier to satisfy.' Based on Ruskey's imputed knowledge and the Entity Defendants' alleged concealment, it is reasonably conceivable that the Entity Defendants knowingly participated in Ruskey's alleged breaches of fiduciary duty." (*BrandRep*, *supra*, 2019 WL 117768, at p. *6.)

### *Cumming*

In *Cumming v. Edens* (Del. Ch. 2018) 2018 WL 992877 (*Cumming*), plaintiff alleged that the board of directors of New Senior breached their fiduciary duties in connection with a transaction whereby New Senior acquired assets at an unfair price from Holiday, an entity controlled by Fortress, itself a stockholder of New Senior that appointed all six members, including two of its officers (Edens and Givens) to New Senior's board. (*Id*. at pp. *1–*3.) Edens was also Fortress's founder, largest stockholder, and the co-chairman of its board of directors. (*Id*. at p. *3.) The court concluded that plaintiff had adequately alleged that Fortress and various of its subsidiaries aided and abetted the alleged breaches of fiduciary duty by New Senior's board:

19

"Based on the well-pled facts in the complaint, it is reasonably conceivable that all five of the alleged aiders and abettors knowingly participated in the directors' alleged breaches. Under Delaware law, 'the knowledge of an agent acquired while acting within the scope of his or her authority [and the acts of agents in that scope] [are] imputed to the principal.' In *In re Emerging Communications*[, *supra*, 2004 WL 1305745], applying this fundamental agency principle, the court held that two entities were 'liable for having aided and abetted' an individual defendant where the entities were under the control of that defendant and 'were the mechanisms through which' that defendant 'accomplished' the challenged transaction. This same type of scheme is alleged here—Givens and Edens are alleged to have facilitated the Challenged Transactions through the various Fortress subsidiaries named as aiders and abettors. Under basic principles of agency, all of their knowledge is imputed to the Fortress entities they served as agents. [¶] . . . [¶] The allegations are similarly compelling against Fortress. Plaintiff alleges that Fortress pushed the Acquisition in furtherance of a broader plan to shift its assets under management to publicly-traded companies that were externally managed by Fortress, such as New Senior, so it (through FIG) could charge higher management fees over longer periods of time. He further alleges that FHIF, Fortress' private equity fund that is the majority owner of Holiday, pushed the Holiday sale to facilitate the 'return of capital to its investors' in advance of its 'maturity date of January 2017.' Those allegations, when coupled with the allegations that Givens ran the negotiations for New Senior and made bids for the Holiday Portfolio without any authorization from a Board comprised of members that were either interested in the Challenged Transactions or beholden to others who were, create a reasonably conceivable narrative that Fortress knowingly

20

participated in the Board's and Givens' breaches." (*Cumming*, *supra*, 2018 WL 992877, at pp. *26–*27.)

### Plaintiffs Have Sufficiently Alleged Aiding and Abetting Breach of Fiduciary Duty

Applying the foregoing authorities, we conclude that plaintiffs have adequately alleged "knowing participation" on the part of the VC Stockholders here. The TAC alleges that the VC Directors were general partner, managing members, or "partner emeritus" of their respective VC Stockholders, and "were agents of and made decisions for their respective VC Stockholder," in particular that each VC Director "makes decisions for [their respective VC Stockholder] in relation to its ART holdings, and gives instructions to [the VC Stockholder] personnel and dictates the actions of [the VC Stockholder], in relation to ART." The VC Directors were thus "representative[s] of the secondary actor who either controls the actor or who occupies a sufficiently high position that his knowledge is imputed to the secondary actor" so that the "test [for knowing participation] is easier to satisfy." (*PLX*, *supra*, 2018 WL 5018535, at p. *49.)

The TAC further alleges that through their control of their respective VC Stockholders, the VC Directors appointed themselves to ART's board. The TAC then alleges that the VC Directors—improperly concerned about their own individual liability to ART's creditors instead of maximizing value for ART's stockholders—approved the Walmart transaction, despite it undervaluing the company and providing no value whatsoever to the holders of ART's common stock. Then, after the board approved the transaction, the VC Directors "change[d] hats" (*Forsythe*, *supra*, 2007 WL 2982247, at p. *3), and now acting as the managing members or controllers of their respective VC Stockholders, voted the VC Stockholders' shares in favor of the transaction by executing the written consent. As in *Forsythe*, "the same

21

individuals who . . . made [the decision to approve the transaction] are also high-level [VC Stockholder] executives," and it is that decision that "form[s] the basis of the plaintiffs' breach of fiduciary duty claims." (*Forsythe, supra*, 2007 WL 2982247, at p. *13.) And as in *Emerging* and *Cumming*, because the VC Directors executed the written consent on behalf of their respective VC Stockholders, the VC Stockholders were the "mechanisms through which [the VC Directors] accomplished the [transaction]." (*Emerging, supra*, 2004 WL 1305745, at p. *38; *Cumming, supra*, 2018 WL 992877, at p. *26.)

The VC Stockholders argue that a finding of knowing participation requires that the entity defendants offer "substantial assistance" to the primary wrongdoer or have "improper motives of their own," and attempt to distinguish the cases discussed above on the grounds that the entity defendants in them took independent action or stood to gain from the breaches at issue. In particular, the VC Stockholders argue that in *PLX* the entity Potomac itself "owned PLX stock, filed Schedule 13Ds, served books and records demands, nominated the dissident director slate, filed the proxy materials, and stood to collect the short-term gains from a quick sale." (*PLX, supra*, 2018 WL 5018535, at p. *49.) They attempt to distinguish *Khanna* on the grounds that Crosspoint itself "needed a bailout" from its investment in BlueStar, and itself instigated the challenged transaction. (*Khanna, supra*, 2006 WL 1388744, at p. *5.) They rely on a single word in *Carr*—the statement that "both" NEA and Klein had a financial incentive to complete the challenged transaction. (*Carr, supra*, 2018 WL 1472336, at p. *16.) They argue that *BrandRep*'s result turned on the fact that the entity defendants themselves "concealed their use of BrandRep's software." (*BrandRep, supra*, 2019 WL 117768, at p. *6.) And in *Cumming*, they rely on a statement in the introduction that Fortress was "advancing its own interests," (*Cumming*,

*supra*, 2018 WL 992877, at p. *1), and the statement that Fortress itself "pushed the Acquisition in furtherance of a broader plan to shift its assets under management to publicly-traded companies." (*Id*. at p. *27.)

Such nitpicking is not availing.

To begin with, the opinions in these cases did not analyze or rely on the motives or actions of the entity defendants in finding that knowing participation had been alleged—or, in two cases, proven. Put slightly differently, in each case, the VC Stockholders identify language that played no part in the court's analysis. In fact, *Forsythe*, *Khanna*, *Carr*, and *Cumming* do not even mention "substantial assistance," and *PLX* does so only in its quotation of the Restatement of Torts. *Cumming* expressly noted that allegations that aiders and abettors materially benefitted from the challenged transaction are not required to support an aiding and abetting claim. (See *Cumming*, *supra*, 2018 WL 992877, at p. *26.) Moreover, the VC Stockholders' argument ignores *Emerging* and *Forsythe*, where knowing participation was found even though the entity defendants were not alleged to have provided substantial assistance or to have had improper motives. (See *Emerging*, *supra*, 2004 WL 1305745, at p. *38; *Forsythe*, *supra*, 2007 WL 2982247, at p. *13.)

The VC Stockholders' reliance on *In re Oracle Corporation Derivative Litigation*, *supra*, 2020 WL 3410745, for their argument that "substantial assistance" is required, is also misplaced. There, Oracle acquired Netsuite, before which acquisition officers of Oracle had certain discussions with officers of Netsuite regarding a "price collar" for the acquisition and NetSuite's status as an independent entity post-acquisition. Although these discussions were disclosed to NetSuite's stockholders, plaintiffs—shareholders of Oracle—alleged that the disclosures were inadequate.

23

Plaintiffs further alleged that the Netsuite officers aided and abetted the Oracle officers' breach of duty to Oracle's own shareholders by failing to make adequate disclosures to NetSuite's shareholders. (*Id*. at pp. *2, *3, *12.) The court held that knowing participation had not been alleged for lack of substantial assistance, because it was not reasonably conceivable that adequate disclosures would have prevented the transaction, and in so doing, the court stated—without citation to authority—that "[t]o withstand a motion to dismiss, a plaintiff must plead facts making it reasonably conceivable that the defendant knowingly supported a breach of duty *and* that his resulting assistance to the primary actor constituted substantial assistance in causing the breach." (*Id*. at pp. *11, *15.)

But in any event, *Oracle* is factually distinguishable because the alleged aider and abettors there—officers of NetSuite—were third parties unrelated to Oracle. Here, by contrast, where "the fiduciary and primary wrongdoer is also a representative of the secondary actor," the test for knowing participation "is easier to satisfy." (*PLX, supra*, 2018 WL 5018535, at p. *49.) To the extent that *Oracle* can be read to suggest "substantial assistance" is required for a finding of "knowing participation" even in these circumstances, it is inconsistent with the other authorities discussed above.[3]

In sum, we conclude that the TAC adequately alleges that the VC Stockholders aided and abetted the alleged breaches of fiduciary duty by the

---

[3] The VC Stockholders also cite *In re Comverge, Inc.* (Del. Ch. Nov. 25, 2014) 2014 WL 6686570, but that case merely explained that aiding and abetting liability may exist in situations where the aider-and-abettor, for self-interested reasons of its own, misleads the board into breaching its duty of care. (*Id*. at p. *18.) It certainly did not hold that an aider-and-abettor *must* have independent improper motives in order to support a finding of knowing participation.

VC Directors.  In light of this conclusion, we need not reach the issue of whether plaintiffs adequately alleged the existence of a "control group."

## DISPOSITION

The order sustaining the VC Stockholders' demurrer to the second cause of action for aiding and abetting breach of fiduciary is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.  Plaintiffs shall recover their costs on appeal.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

*Chodniewicz v. Art.com* (A159720)

26